FIFTH DIVISION

                                     December 22, 2000 

No. 1-99-1253

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

TYREZ TAYLOR,

Defendant-Appellant.

))))) ))))

Appeal from the

Circuit Court of

Cook County

Honorable

Fred G. Suria,

Judge Presiding.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

At a jury trial, defendant Tyrez Taylor was found guilty of home invasion, armed robbery, and residential burglary, but was found not guilty of first degree murder.  Thereafter, the trial court sentenced defendant to concurrent terms of 24 years of imprisonment on the charges of armed robbery and home invasion, and four years on the charge of residential burglary.

On appeal, defendant claims that (1) his conviction on the home invasion charge must be vacated because the crime was not committed in the "dwelling place of another" or, in the alternative, because the victim gave a codefendant permission to enter the apartment; (2) his conviction on the residential burglary charge must be vacated because his codefendant was a resident of the apartment involved and because the apartment was no longer a "dwelling place" after the victim was dead; (3) the jury's verdicts were legally inconsistent where the jury acquitted him of first degree murder but found him guilty of armed robbery; and (4) his sentence is disproportionate, in violation of fundamental fairness, where an equally culpable codefendant pled guilty to a more serious offense and received a lesser sentence.  We affirm the judgment of the trial court as to the residential burglary and armed robbery counts and reverse the judgment of the trial court as to the home invasion count.

The only account of the events occurring in the early morning hours of August 15, 1995, was presented to the jury from a statement given by defendant while he was in custody at the Area Two police station and published through Assistant State's Attorney Sharon Opryszek at trial.  According to defendant's statement, early in the morning on Tuesday, August 15, 1995, defendant was sitting on the front porch of his girlfriend Jackie's apartment at 10749 South Prairie with Jackie, Edward Caples, and Shanika, the mother of Caples' child.  At approximately 4:30 a.m., Brian Heath joined defendant and the others on the porch and began complaining that Raymond Winters had accused Heath of stealing from him.  In his statement, defendant indicated that he knew that Heath had been "staying with" Winters at 10810 South Calumet "for a while."  Heath showed defendant and Caples a .38-caliber revolver, which was loaded with five rounds, and defendant watched Heath put the revolver in the waistband of his pants.  Heath, Caples, and defendant then went to Winters' apartment building at 10810 South Calumet.

When the men arrived at Winters' apartment building, defendant and Caples stood outside an apartment located behind Winters' apartment.  Heath, however, walked to Winters' bedroom window and called out Winters' name.  Moments later, Winters, who was nude, opened the door and let Heath into the apartment.  According to defendant's statement, after a minute or two, defendant and Caples heard the sound of a gunshot coming from inside Winters' apartment and both men ran to a second-floor apartment at 10748 South Prairie.

Three to five minutes after defendant and Caples arrived at 10748 South Prairie, Heath also arrived there and rang the bell to gain entrance into the building.  Defendant and Caples went down the stairs to open the door for Heath, who entered the stairwell and stated, "I told you niggers I ain't no ho.  I'm wild hundreds."  Defendant's statement indicated that "wild hundreds" was understood by defendant to mean "crazy."  According to the statement, Heath was laughing and smiling.  Once the men entered the apartment, Heath took a watch, a gold neck chain with an "S" medallion, a ring, and some cash out of his pockets.  Heath gave the neck chain to defendant and the ring to Caples, then gave the two men some of the cash.  Heath then began bragging that Winters was naked when he answered the door and that Heath pointed the gun at Winters' head and pulled the trigger.  Heath further boasted that he took Winters' money and jewelry from a table and used a shirt to cover the doorknob so he would not leave fingerprints when he left.  After Heath made these statements, the three men slept on the floor of the apartment for "a couple of hours."

According to defendant's statement, when the men awoke they went back across the street to Jackie's front porch, where defendant told Jackie that the three men were going to Evergreen Plaza on 95th and Western.  The statement reads that Heath bought new clothes for everyone at Evergreen Plaza, then Heath bought some alcoholic beverages, and all three men returned to the apartment at 10748 South Prairie.  At the apartment, defendant, Heath, and Caples drank, showered and changed their clothes.  Then, they walked around outside for a while before returning to 10748 South Prairie.

In the statement, defendant indicated that early Wednesday morning, August 16, 1995, Heath left to get Winters' car, a beige Chevy Impala.  Defendant, Caples, and two other individuals were standing in front of Jackie's apartment when Heath drove past them in Winters' car.  When Heath returned, he left the car and went to a party with an individual referred to as "Chubby."  According to the statement, defendant later found out that Heath and "Chubby" took the gun used to shoot Winters and threw it into a sewer.

After Heath left, the statement indicates that defendant, accompanied by Caples, drove the car to two different houses, then drove to 27th and Prairie to visit his cousins.  Defendant, Caples, and defendant's cousins got drunk together, then defendant drove one of his cousins and Caples back to Jackie's apartment.  There, defendant and Jackie argued and Jackie took Winters' chain from defendant and threw it in the bushes.  Defendant, Caples, and "Chubby" left Jackie's apartment to put more gas in Winters' car, then defendant drove alone to a friend's house on Yates where he spent the night.  According to defendant's statement, on Thursday, August 17, 1995, at approximately 11:30 a.m., defendant left Winters' car in the alley behind the apartment at 10748 South Prairie.

Ishna Davis, who was dating Heath in August of 1995, testified that she saw Heath and defendant exiting Winters' apartment complex carrying bags of clothes at approximately 4 p.m. on either Tuesday, August 15, or Wednesday, August 16.  Davis testified that Heath and defendant got into a four-door "yellowish Chevy" and put the bags in the car.  When Davis approached Heath and defendant, she saw a beeper and a gold chain with an "S" on top of one of the bags.  Approximately one-half hour later, Davis saw Heath and defendant in the same four-door Chevy at the intersection of Calumet and Forest Streets.  Davis testified that Heath was driving the car and defendant was in the front passenger seat.  Davis stated that she leaned into the car to talk to Heath and saw the brown handle of what might have been a gun sticking out from underneath the driver's seat.  Davis also testified that she saw defendant putting on the gold chain with an "S" that she had seen on top of the bag earlier.

Winters' sister and Winters' friend, Carol Winters and Anton Franklin, respectively, gave substantially the same testimony regarding their discovery of Winters' body.  At approximately 10 p.m. on Wednesday, August 16, Carol, Anton, and Anton's fiancee, Pia, went to Winters' apartment because Carol had been unable to reach Winters for almost two days.  When they arrived at Winters' apartment, they noticed that Winters' car was gone and that the window in Winters' living room was open.  Carol had a key to the front door of Winters' apartment but she could not open the door, so she asked Anton to climb into the apartment through the open window.  Once inside the apartment, Anton turned on the lights and discovered Winters' naked body lying facedown on the floor across the front door.  When Carol heard Anton crying out Winters' name, she pushed the door until it opened a little and she was able to see that the door was blocked by Winters' body.  The police were called and arrived about an hour later.  Both Carol and Anton testified that Winters always wore a gold chain with a charm in the shape of an "S".

Chicago police officer William Callahan testified that he was on routine patrol with his partner, Officer Maureen Sakalas, when he received a radio dispatch of shots fired at 10810 South Calumet.  According to Officer Callahan, 10810 South Calumet was a "four-flat," which looked like "kind of a road side motel type of building."  The complex consisted of two two-story buildings with two apartments in each building.  Officer Callahan approached the front of the building and saw two women standing on the sidewalk crying.  The women told Officer Callahan that Winters was dead inside the apartment.

Chicago police detective Paul Alfini testified that, on August 18, 1995, he learned that Winters' car had been recovered in an alley at 10749 South Indiana.  On August 23, 1995, Detective Alfini interviewed Ishna Davis.  After interviewing Davis, Detective Alfini began to search for defendant, Heath, and Caples.  That same day, Detective Alfini interviewed a man named Edward Kelly.  Detective Alfini testified that, after the interview, Kelly led him to the corner at 10758 South Forest and pointed to a sewer drain at that location.  Detective Alfini then called the department of sewers and later recovered a silver-colored, .38-caliber revolver with a brown wooden handle from that location.  Detective Alfini testified that the serial number had been filed off of the revolver and the revolver contained four live .38-caliber rounds.

Chicago police detective William Foster testified that at approximately 9:30 p.m. on September 5, 1995, he was doing follow-up work on the Winters homicide when Chicago police officers Cain and Bass brought defendant into the Area Two police station and placed defendant in an interview room.  Chicago police detectives Foster and Filipiak then went into the interview room to interview defendant.  However, Detective Foster testified that, after giving defendant his rights under 
Miranda
, he felt that defendant was under the influence of alcohol and decided to interview defendant after he became sober.

Detective Foster testified that at approximately 4 p.m., on September 6, 1995, he and Detective Filipiak returned to Area Two to interview defendant.  Detective Foster testified that he brought defendant some food from McDonald's.  While defendant was eating, the detectives gave defendant 
Miranda
 warnings again and asked him if he would discuss Winters' death with them.  At approximately 8:30 p.m., Detective Foster returned to the interview room with Detective Alfini and again gave defendant 
Miranda
 warnings.  Defendant and the detectives conversed at that time and defendant remained in custody.  After this conversation with defendant, Detective Foster spoke with Assistant State's Attorney Sharon Opryszek.  Detective Foster testified that he and Opryszek then gave defendant 
Miranda
 warnings again, interviewed defendant, took a handwritten statement from defendant, and reviewed defendant's statement with him.

Assistant State's Attorney (ASA) Sharon Opryszek testified that she interviewed defendant with Detective Foster at approximately 1 a.m. on September 7, 1995.  Prior to the conversation, ASA Opryszek introduced herself as an assistant State's Attorney, explained to defendant that she was not his attorney, and read defendant 
Miranda
 warnings.  She testified that the conversation lasted less than a half an hour.  After the conversation, ASA Opryszek asked Detectives Foster and Alfini to find Caples so she could also interview him.

Detectives Foster and Alfini arrested Caples about a half an hour later and brought him to Area Two, where he was interviewed by ASA Opryszek and Detective Alfini at approximately 2:30 a.m.  ASA Opryszek testified that after her conversation with Caples she spoke with defendant, who was eating a hamburger and drinking a soft drink.  ASA Opryszek told defendant that she had just spoken with Caples and she refused defendant's request to be allowed to speak with Caples.  ASA Opryszek then left defendant and took a written statement from Caples.

ASA Opryszek testified that after she finished taking Caples' statement at approximately 5:15 a.m., she returned to speak with defendant.  ASA Opryszek relayed to defendant what Caples told her and defendant stated that he wanted to tell her the truth about what happened to Winters.  ASA Opryszek and Detective Foster then took defendant to another room, where defendant gave his statement and ASA Opryszek recorded it in her handwriting.  ASA Opryszek testified that she finished taking defendant's statement at approximately 6:30 a.m., then she reviewed defendant's written statement with defendant by reading it aloud with him and by having defendant read aloud portions of the statement alone.  Corrections were made and signed by defendant, ASA Opryszek, and Detective Foster.  ASA Opryszek testified that she, defendant, and Detective Foster also signed the bottom of each page after it was read aloud, indicating that the written statement was an accurate reflection of what defendant told ASA Opryszek.  The contents of defendant's statement as admitted into evidence at trial have already been discussed above and will not be repeated here.

The evidence showed that the Cook County medical examiner's office recovered a lead, medium-caliber bullet from Winters' brain and ruled that Winters died as a result of a gunshot wound to the head.  The parties stipulated that, if called to testify, James Leacy, a firearms expert, would testify that he received a Taurus .38-caliber revolver, four live rounds, and the bullet recovered from Winters' brain.  It was further stipulated that Leacy would testify that, due to the condition of the bullet that was recovered from the victim, he was unable to make an identification that the bullet came from a specific weapon.  The parties also stipulated that if called to testify William Harris, a fingerprint expert, would testify that no fingerprints were recovered from the gun or bullets and that the fingerprints recovered from the door jamb of Winters' car and from the crime scene did not match the fingerprints of the defendant or the victim.

Defendant did not present any additional evidence at trial.  After defendant's motion for directed verdict was denied, defendant waived his right to testify and the defense rested.  After hearing closing arguments, the jury received its instructions and retired to deliberate.  The jury found defendant guilty of armed robbery, home invasion, and residential burglary, and found defendant not guilty of first degree murder.

Defendant's sentencing hearing was held on December 17, 1998.  The trial court denied defendant's motions for judgment of acquittal notwithstanding the verdict and for a new trial.  The trial court said it had considered all the aggravating and mitigating factors and sentenced defendant to concurrent terms of 24 years of imprisonment on the armed robbery and home invasion charges, and four years on the residential burglary charge.  The court subsequently denied defendant's motion to reconsider sentence.  This appeal followed.

First, defendant argues that his conviction for home invasion must be vacated because the crime was not committed in the "dwelling place of another" and because the victim gave Heath permission to enter the apartment.  We agree.

With respect to such an issue, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  
People v. Campbell
, 199 Ill. App. 3d 775, 785, 557 N.E.2d 556 (1990) quoting 
People v. Young
, 128 Ill. 2d 1, 49 (1989), quoting  
Jackson v. Virginia
, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89 (1979).  Then, " '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as the weigher of the evidence is preserved through a legal conclusion that upon judicial review 
all the evidence
 is to be considered in the light most favorable to the prosecution.' "  
(Emphasis in original.)  
People v. Collins
, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985), quoting 
Jackson
, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct at 2789.

Under Illinois' statute, a person who is not a peace officer commits home invasion "when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present" and he or she "[i]ntentionally causes any injury to any person or persons within such dwelling place."  720 ILCS 5/12-11(a)(2) (West 1998).  The State concedes that defendant could only be guilty of home invasion and armed robbery based on the theory of accountability for the actions of codefendant Heath.  A person is legally accountable for the conduct of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."  720 ILCS 5/5-2(c) (West 1998).  In determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during the commission of the offense, the defendant's continued close affiliation with other offenders after the commission of the crime, the defendant's failure to report the crime, and the defendant's flight from the scene.  
People v. Taylor
, 164 Ill. 2d 131, 141, 646 N.E.2d 567 (1995).

The gravamen of a home invasion offense is unauthorized entry.  
Campbell
, 199 Ill. App. 3d at 786.  The State argues that we should apply the "limited authority doctrine," which holds that when a defendant comes to a private residence and is invited in by the occupant, the authorization to enter is limited and criminal actions exceed this limited authority.  
People v. Peeples
, 155 Ill. 2d 422, 487, 616 N.E.2d 294 (1993).  Under the limited authority doctrine, where the defendant enters with an innocent intent, that entry is authorized and criminal actions thereafter engaged in by the defendant do not change the status of the entry.  
People v. Bush
, 157 Ill. 2d 248, 254, 623 N.E.2d 1361 (1993).  Thus, under the limited authority doctrine, the determination of whether an entry is unauthorized depends on whether the defendant possessed the intent to perform a criminal act therein at the time of entry.  
Bush
, 157 Ill. 2d at 254.

Defendant argues that Heath's authority to enter the apartment at 10810 South Calumet was not limited because Heath lived at the apartment with Winters.  Thus, argues defendant, Heath did not commit a home invasion by entering the "dwelling place of another" for which defendant could be held accountable.  See 
People v. Reid
, 179 Ill. 2d 297, 316-17, 688 N.E.2d 1156 (1997) (defendant did not commit home invasion when he murdered the victim in an apartment they jointly rented and the apartment was still being rented by the defendant at the time of the murder); 
People v. Moulton
, 282 Ill. App. 3d 102, 107, 668 N.E.2d 1078 (1996) (defendant retained an ownership interest in the dwelling and, as a joint tenant of the property, did not fall within the scope of the home invasion statute).

Given the facts of the cause before this court, we hold that the limited authority doctrine does not apply.  Here, there was evidence that Heath had been staying with Winters on a regular basis as an overnight guest.  This fact distinguishes this case from the facts in 
Peeples
, where the evidence supported the inference that defendant gained access to the victim's apartment through trickery and deceit, under the pretense of borrowing a cup of sugar.  Likewise, in another case cited by the State, 
People v. Hill
, 294 Ill. App. 3d 962, 965-66, 691 N.E.2d 797 (1998), the elderly victim allowed the defendant into her home for the limited purpose of loaning him $10 and upon entry the defendant cut her throat.

Although the State on appeal asserts that Heath was not actually staying in Winters' apartment, this assertion is belied by defendant's statement.  According to that statement, which was written by an assistant State's Attorney, on the night in question, Winters gave Heath authority to enter Winters' apartment not only as an invited guest, but Heath had also been "staying with" Winters "for a while."  Based on this uncontradicted evidence, we find Winters' apartment was also Heath's dwelling place and his actions inside the apartment did not change his status as a resident.

Since Heath did not enter the "dwelling place of another," we hold that the facts in the present case would not allow a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of home invasion based on an accountability theory.  Thus, we vacate defendant's conviction and sentence on the charge of home invasion.

Second, defendant argues that his conviction for residential burglary must be vacated because Heath was a resident of the apartment involved and because the apartment was no longer a "dwelling place" after Winters was dead for purposes of the residential burglary statute.  We disagree.

Under Illinois' statute, "a person commits residential burglary who knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft."  720 ILCS 5/19-3 (West 1998).  For purposes of the residential burglary statute, "dwelling" means "a house, apartment, mobile home, trailer, or other living quarters in which at the time of the alleged offense the owners or occupants actually reside or in their absence intend within a reasonable period of time to reside."  720 ILCS 5/2-6(b) (West 1998).

Defendant cites to 
People v. Moore
, 206 Ill. App. 3d 769, 565 N.E.2d 154 (1990), to support the proposition that the State must prove that the owner of the place that was burglarized intends to return and use it as a dwelling.  Defendant also cites to 
People v. Bonner
, 221 Ill. App. 3d 887, 583 N.E.2d 56 (1991), to support his argument that a residence where the owner has died is not a "dwelling place" within the meaning of the residential burglary statute.

We find that defendant's reliance on these cases
 is misplaced.  In 
Bonner
, 221 Ill. App. 3d at 889-90, the court did not address the issue of whether the victims' house was a "dwelling place" because the parties had already agreed that it was not.  The house in 
Bonner
 had not been occupied for seven years prior to the burglary.

Additionally, this court's decision in 
Moore
 actually supports the position of the State.  In 
Moore
, the occupant of the burglarized house had been in Mississippi looking for a job for about a month.  He left the house fully furnished but disconnected the electricity, gas, and telephone service before he left.  The defendants claimed that the house was not inhabited at the time of the burglary and that the occupant had no intention of returning to it.

However, this court found that even though the occupant was absent at the time of the burglary and intended to sell the house upon his return to Chicago, the house was still a "dwelling place."  
Moore
, 206 Ill. App. 3d at 774.  The court stated that "[t]he residential burglary statute applies to burglaries of structures intended for use as residences, regardless of whether the structure was being actively used as a residence at the time of the burglary."  
Moore
, 206 Ill. App. 3d at 773.  The 
Moore
 court also cited to 
People v. Sexton
, 118 Ill. App. 3d 998, 1000, 455 N.E.2d 884 (1983), where this court stated that the "legislative purpose of deterring residential burglaries would not be served by making the application of the statute dependent upon the wholly fortuitous circumstance of whether a structure intended to be used as a residence was actually being used as a residence at the time the burglary was committed."  We follow the reasoning of this court in 
Sexton
 and 
Moore
.

We find that, despite the fact that Winters was lying dead in his apartment at the time of the burglary, the jury could have reasonably concluded that the apartment was a "dwelling place" for purposes of the residential burglary statute.  It was undisputed in this case that the apartment at 10810 South Calumet was intended for use as a residence.  Evidence was presented to the jury that the apartment was being used as a residence by Winters at the time of his death and that his body remained in the apartment until well after the burglary had been completed.  There was also testimony that the apartment was part of a larger building used solely for residential purposes.

Defendant next argues that, as Heath was "staying with" Winters, Heath could not be found guilty of residential burglary and, consequently, defendant could not be found guilty of residential burglary based on accountability.  However, the evidence demonstrated that defendant's conviction for residential burglary was not based solely on an accountability theory.  Ishna Davis testified that she saw defendant exiting Winters' apartment complex carrying bags of clothes and the victim's necklace on the day of the shooting or the following day.  Defendant responds that because Heath had permission to be in Winters' apartment, Heath could give defendant permission to enter the residence.  Any permission that Heath had to be in Winters' apartment certainly ended when Heath killed Winters.  See 
Hill
, 294 Ill. App. 3d at 973.  The deceased victim could not then authorize Heath to allow defendant to enter the residence and steal his possessions.  Therefore, we find that defendant was properly convicted of residential burglary.

For purposes of his appeal on the armed robbery count, defendant has conceded that he is accountable for Heath's conduct but argues that the jury's verdicts were legally inconsistent where the jury acquitted him of first degree murder but found him guilty of armed robbery.  We disagree.

Illinois cases recognize two types of inconsistencies in verdicts: logical inconsistency and legal inconsistency.  
People v. Rhoden
, 299 Ill. App. 3d 951, 957, 702 N.E.2d 209 (1998).  As a general rule, verdicts that acquit and convict a defendant of crimes composed of different elements, but arising out of the same set of facts, are not legally inconsistent.  
People v. Klingenberg
, 172 Ill. 2d 270, 274, 665 N.E.2d 1370 (1996).  Logically inconsistent verdicts may stand, while legally inconsistent verdicts cannot.  
Klingenberg
, 172 Ill. 2d at 274.

An acquittal of a murder charge does not preclude an armed robbery conviction, nor would such a verdict be legally inconsistent.  
People v. Austin
, 264 Ill. App. 3d 976, 980, 637 N.E.2d 585 (1994).  This is true even where the jury acquits the defendant of felony murder based on armed robbery and it is unclear whether the taking occurred before or after the killing.  See 
People v. Clemons
, 179 Ill. App. 3d 667, 534 N.E.2d 676 (1989); see also 
People v. Hill
, 294 Ill. App. 3d 962, 691 N.E.2d 797 (1998).  In the case at bar, the jury's verdicts cannot be considered legally inconsistent because its resolution of one charge did not preclude an opposite resolution on the other charge.  See 
Austin
, 264 Ill. App. 3d at 980.

In 
People v. Dawson
, 60 Ill. 2d 278, 326 N.E.2d 755 (1975), the supreme court held that there was no inconsistency where a defendant was acquitted of murder and felony murder but convicted of armed robbery.  Citing the court's reasoning in 
Dawson
, the appellate court later found that "the salutary principle of leaving the jury 'free to exercise its historic power of lenity' forbids allowing an acquittal on one charge to affect a simultaneous conviction."  
People v. Rudolph
, 50 Ill. App. 3d 559, 565, 365 N.E.2d 930 (1977).

A person commits armed robbery when he or she "takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force" (720 ILCS 5/18-1(a) (West 1998)) and "(1) he or she carries on or about his or her person or is otherwise armed with a dangerous weapon other than a firearm; or (2) he or she carries on or about his or her person or is otherwise armed with a firearm."  720 ILCS 5/18-2(a) (West Supp. 1999).

A person who kills an individual without lawful justification commits first degree murder if, in performing the acts that cause the death: (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or (3) he is attempting or committing a forcible felony other than second degree murder.  720 ILCS 5/9-1(a) (West 1998).

According to the evidence from the record, and in consonance with existing Illinois law, we do not find the jury's verdicts in this case to be legally inconsistent because a comparison of the essential statutory elements of first degree murder and of armed robbery shows that the elements are distinct.  Thus, we uphold defendant's armed robbery conviction.

Finally, defendant argues that his 24-year sentence is disproportionate, in violation of fundamental fairness, where Caples, an equally culpable codefendant, pled guilty to the more serious crime of murder and received only a 20-year sentence.  We disagree.

The standard of review as to the issue of an excessive sentence is whether the trial court abused its discretion.  
People v. Cox
, 82 Ill. 2d 268, 275, 412 N.E.2d 541 (1980).  Additionally, we recognize that the trial court is in the best position to determine the appropriate punishment, and its decision is entitled to great weight and deference.  
People v. Modrowski
, 296 Ill. App. 3d 735, 751, 696 N.E.2d 28 (1998).

The general rule as to the question of whether defendant's sentence was unfairly disparate is that arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible.  
People v. Caballero
, 179 Ill. 2d 205, 216, 688 N.E.2d 658 (1997).  However, the mere disparity of sentences does not, by itself, establish a violation of fundamental fairness.  
Caballero
, 179 Ill. 2d at 216.

A sentence imposed on a codefendant who pleaded guilty as part of a plea agreement does not provide a valid basis of comparison to a sentence entered after a trial.  
Caballero
, 179 Ill. 2d at 217.  Dispositional concessions are properly granted to defendants who plead guilty when the interest of the public in the effective administration of criminal justice would thereby be served.  
Caballero
, 179 Ill. 2d at 218.

In 
Caballero
, the supreme court found that the codefendant who pled guilty (1) acknowledged his guilt and showed willingness to assume responsibility for his conduct; (2) made a public trial unnecessary; and (3) gave cooperation which resulted in the successful prosecution of another offender engaged in equally serious or more serious criminal conduct.  179 Ill. 2d at 218.  As a result, the supreme court found that the defendant could not establish that the disparate treatment of himself and his codefendant was unreasonable or unwarranted.  
Caballero
, 179 Ill. 2d at 218.  Similarly, in this case, we find that defendant cannot establish that the disparate treatment of himself and Caples was unreasonable or unwarranted.

Based on the record before this court, we find that the trial court did not abuse its discretion in sentencing defendant to 24 years' imprisonment.  In addition, because the 24-year term of imprisonment for the home invasion conviction was to run concurrently with the 24-year term of imprisonment for the armed robbery conviction, we find that there is no need to remand this cause for resentencing despite the fact that the home invasion conviction has been vacated.  
People v. Curry
, 296 Ill. App. 3d 559, 569, 694 N.E.2d 630 (1998).

For all of the foregoing reasons, we vacate defendant's conviction and sentence for home invasion.  We also uphold defendant's armed robbery and residential burglary convictions and defendant's sentence of 24 years' imprisonment.

Affirmed in part and vacated in part.

GREIMAN and REID, JJ., concur.