THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE A. DELACRUZ, Defendant-Appellant.

Second District   No. 2—03—0360

Opinion filed October 14, 2004.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

Meg Gorecki, State's Attorney, of St. Charles (Martin P. Moltz, of State's

Attorneys Appellate Prosecutor's Office, of counsel), and Mary E. Mack, of Springfield, for the People.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Jose A. Delacruz, appeals his conviction of home invasion (720 ILCS 5/12—11(a)(2) (West 2002)) following a jury trial in the circuit court of Kane County. Defendant challenges the sufficiency of the evidence; specifically, defendant contends that the evidence admitted during the trial sufficiently demonstrated that he still resided in the dwelling so as to nullify the statutory element that required a defendant to enter the dwelling of another. Defendant also contends that there was insufficient evidence that he caused an injury to the victim, E.M., to support his home invasion conviction. We reverse.

The following is a summary of the pertinent evidence presented at trial. E.M. testified that she lived in the rear apartment of a two-flat building in Aurora. Her apartment consisted of a kitchen and a bathroom located to the left of the main entrance, a living room in the middle, and a bedroom at the back of the apartment. E.M.'s friend, Maria Arallano, owned the building and lived in the front apartment. Both E.M. and Arallano worked at 95 Cleaners, and Arallano, who owned a car, would drive E.M. to work.

E.M. testified that she met defendant at a party in July or August 2001. They became boyfriend and girlfriend, and defendant moved in with E.M. in August 2001. The two had a sexual relationship. At some point in the fall of 2001, E.M. traveled to Mexico. When she did so, she gave defendant a key to the apartment. While E.M. was in Mexico, defendant moved his bedroom set into the apartment. E.M. testified that she had not given defendant permission to do so. E.M. testified that she slept in the bed with defendant, and the bedroom set still remained in her apartment at the time of trial.

E.M. testified that, on January 29, 2002, defendant returned her key. Defendant told her he had another key to the apartment but did not explain to her how he got the other key. E.M. also testified that, when she asked defendant to leave and tried to end their relationship, she never received the other key from defendant, who explained to her that he either had thrown it away or had lost it.

E.M. testified that defendant lived with her in her apartment from August 2001 to March 4, 2002, when she ended their relationship. E.M. had been trying to get defendant to move out for about two months, but it was not until March 4, 2002, that defendant finally moved his clothes out of E.M.'s apartment. She had not wanted the relationship to continue, but he had threatened her. While E.M. testi-

fied that defendant no longer lived with her on March 21, 2002, she did not know if he lived somewhere else. E.M. also testified that, on March 4, 2002, after she told him that she did not want to see him any longer, he was still living with her. E.M. had the following colloquy with the prosecutor:

"[Prosecutor] Q. And on March 21st of 2002, was the defendant still living with you at that time?

[E.M.] A. Yes. I couldn't get him out of there."

E.M. described the events of the incident. On March 21, 2002, E.M. went to work at about 8 a.m. and returned to her apartment between 5 and 5:30 p.m., having been driven home by Arallano. According to E.M., defendant was waiting outside of her apartment and had opened the door, which E.M. had locked when she left that morning. E.M. testified that she had not planned to meet defendant that evening and did not want him in her apartment. She was frightened upon noticing that her door was open and decided to go into Arallano's apartment.

When defendant saw her, he grabbed her under her arms and picked her up before she could get into Arallano's apartment. Arallano, who was observing this, was holding her child and could not assist E.M. E.M. kicked her legs and pulled at defendant's hands in an unsuccessful attempt to escape. As she was being carried into her apartment, she began to scream and grabbed onto the doorjamb, but was unable to hold on.

Once they were in the apartment, defendant, who was wearing white gloves, threw E.M. onto the bed and locked the bedroom door. E.M. screamed, but defendant told her not to do that and not to move, "because in less than 10 minutes, he could do something." Defendant then showed E.M. a number of pieces of packing tape cut into six-inch segments, a rope that he stretched out, and men's ties that E.M. had not seen before. Defendant told E.M. to turn around and said that he had more things he could use on her in less than 10 minutes. E.M. testified that she did not see any other things, but was afraid that defendant might have a weapon. E.M. testified that defendant did not hit or scratch her.

E.M. testified that defendant prevented her from moving by sitting on top of her while she was on the bed. Defendant then ripped E.M.'s sweatshirt and removed all of her clothing. (On cross-examination, E.M. admitted that she had told police that her blouse and bra had been removed after the assault.) After removing her clothing, defendant removed his pants and gloves. E.M. pushed at defendant, but defendant held her hands and even got her hands behind her back, preventing E.M. from moving at all. Then, defendant

"obligated" E.M. to have sexual relations. He opened her legs and when she closed them, he opened them again. Defendant then placed his penis in E.M.'s vagina. E.M. did not scream because he had threatened her. After a brief time, defendant finished and moved back on top of E.M.

E.M. denied that she had told defendant that she wanted to have sex with him. Instead, E.M. repeatedly asked defendant to leave her alone, asked him to tell her what he wanted from her, and asked why he was doing this. Defendant told her that he was moving to California and that she had to go along with him or he would force her to go, using the tools he had in the apartment. E.M. denied that they had an argument about their relationship.

After defendant had finished and was back on top of her, E.M. heard her friends knocking on the apartment door and calling for her. Defendant covered her mouth with his hands and told her not to talk or move. A short time later, the police came to the door. E.M. testified that defendant started to hide the things he had in the bedroom and told her to go out and explain to the police that there was no problem. E.M. dressed, left the bedroom, left the apartment, and met with the police.

Before she was taken to the hospital for examination, E.M. went back into her apartment. She observed the police searching for evidence and taking the items that defendant brought into the bedroom. While she was in the bedroom, an officer showed her one of her kitchen knives. E.M. informed the officer that it had not been in the bedroom when she left for work that morning. E.M. also was shown a dental pick and told the officer that she had never seen it before.

E.M. also testified that, on March 21, 2002, she spoke with Officer Patricia Gonzalez of the Aurora police department. E.M. explained that she was nervous, so she was unable to remember some details, including the removal of her blouse. She told Gonzalez that she and defendant had broken up two months before, that she asked defendant to return her key, but that he told her that he lost it. When Gonzalez was called by defendant to testify, she contradicted E.M.'s account. Gonzalez testified that E.M. told her that defendant did not have a key and told her that defendant had not removed her top and bra during the assault. In addition, Gonzalez testified that E.M. told her that defendant had moved out of the apartment about two months before the assault.

Next, Arallano testified. She had known E.M. for around 18 months and met defendant when E.M. and he started dating. Arallano was aware that defendant lived with E.M. in her apartment and that

they were having a sexual relationship. She also knew that, on March 21, 2002, defendant still had personal property in E.M.'s apartment. Arallano recalled that E.M. had talked to her about changing the locks on her apartment, but Arallano had not done so.

Arallano testified that, on March 21, 2002, she and E.M. arrived home from work and were about to go into Arallano's apartment when defendant appeared at the door of the porch. He picked up E.M. under her arms and carried her to E.M.'s apartment "where they lived." Arallano testified that E.M. loudly told defendant to let her go and struggled while defendant was carrying her. Arallano testified that defendant dragged E.M. into E.M.'s apartment. Arallano went to the door of E.M.'s apartment and knocked on the door to make sure that E.M. was alright. Arallano did not attempt to enter the apartment, but heard E.M. scream her name. Arallano then called two mutual friends and, when they arrived, they knocked on E.M.'s door but were unable to open it. They returned to Arallano's apartment and called the police. Arallano testified that it took the police about a half an hour to arrive.

Officer Damien Cantona, a patrolman for the Aurora police department, testified that, around 6:30 p.m. on March 21, 2002, he was on patrol on the east side of Aurora when he was dispatched to E.M.'s apartment on a domestic disturbance call. He testified that he arrived within two minutes of receiving his dispatch. When he arrived at the apartment, he went to the west side of the building and spoke to Arallano. Next, Cantona walked around to the rear apartment and knocked on the door. He heard nothing from inside the apartment and received no response. He testified that he continued to walk around the back of the building and looked in a window to E.M.'s apartment. He saw E.M., who was dressed, run out of the bedroom. She put her finger to her lips to signal Cantona to be quiet, then exited the apartment. Cantona remained at the window and saw defendant, who was also dressed, come out of the bedroom. Other officers then entered the apartment and arrested defendant.

Cantona testified that he observed E.M. to be distraught and crying. He did not see any obvious physical injuries to either E.M. or defendant. When Cantona prepared his report, he listed defendant's address as 733 High Street in Aurora, different from E.M.'s address. In his report, Cantona also stated that E.M. had related that her relationship with defendant had ended about a month before the incident, after lasting seven months. Cantona transported E.M. to the hospital where a sexual assault examination was performed.

Officer Michael Dabney, an evidence technician for the Aurora police department, photographed E.M.'s apartment and gathered

evidence from it. Dabney testified that he found two white gloves, one near the couch in the living room, and the other on the floor of the bedroom closet. He found a torn black sweatshirt on top of the disarrayed blanket on the bed. Dabney recovered a metal dental pick and a roll of clear packing tape from the bed's headboard. He recovered pieces of the tape stuck on a window covering located between the bed and dresser. Dabney retrieved two men's ties that were sticking out of a drawer in the dresser. On top of the dresser, he found a kitchen knife. In addition, defendant's wallet was taken from the dresser. Dabney testified that he did not find any keys or a rope. He also did not see any signs of forced entry to the apartment.

Evidence concerning the sexual assault kit was admitted by stipulation between the parties. Defendant stipulated that his semen was found on the vaginal swab taken from E.M. when she was examined at the hospital.

Defendant also testified on his own behalf. He testified that E.M. was his girlfriend of about six or seven months and that he had a sexual relationship with her. E.M. lived alone when they met and, later, asked defendant to move in with her, explaining that she was afraid to live by herself. Defendant explained that, at the time E.M. asked him to move in, he had his own apartment that he was fixing up and did not want to move, but eventually, he did take some of his possessions to E.M.'s apartment and live with her. Defendant testified that E.M. had two apartment keys and gave him one. Defendant testified that, when E.M. went to Mexico, he took care of the apartment while she was gone, including paying the rent for it.

On March 21, 2002, defendant was working as a handyman and furniture deliveryman. He had gloves that he wore to protect his hands while delivering furniture. He kept tools that he used for his handyman jobs at E.M.'s apartment. Defendant admitted that the roll of packing tape was his and explained that he had used it to tape all of the windows in the apartment in order to keep out drafts. Defendant testified that he had also nailed the windows shut, because E.M. was scared of an intruder entering through a window. Defendant admitted that the dental pick was his and explained that he had used it once to turn on or repair a heater in the apartment. Defendant testified that it had been in the headboard of the bed for over a month before March 21, 2002, but E.M. probably did not notice it, because she usually did not pay attention to what was in the headboard.

Defendant also testified that, on March 21, 2002, he and E.M. were not "officially" broken up. They had tried to break up, but had not done so completely. Defendant testified that he had twice tried to leave, but E.M. did not want him to, and then would cry, which would

make defendant feel bad. Defendant also testified that E.M. was very jealous and worried that he would meet another girl. Defendant denied that he had an apartment other than E.M.'s. However, defendant explained that, when he spoke to police on March 21, 2002, he gave the address of his brothers' apartment. Defendant testified that, on March 21, 2002, he still had a number of possessions at E.M.'s apartment, including ties, gloves, furniture, and tools.

Defendant testified about the day of the incident. Defendant went to E.M.'s apartment around 7:30 a.m. to see her before she went to work. (Defendant explained that he would "always" go to see her at that time.) After they chatted, defendant hugged E.M. and they parted. According to defendant, E.M. had told him to come by the apartment in the afternoon or call her because she wanted to talk to him. Defendant also testified that E.M. had told him that he could go into the apartment and remove his belongings whenever he wanted. Defendant told E.M. that he might take out some of his things that day and return for the furniture on the weekend.

Defendant testified that he returned to E.M.'s apartment about five minutes before she returned from work, because she had invited him over to talk. Defendant testified that he had a pair of work gloves in his back pocket. Defendant used the key given to him by E.M. to unlock and open the door, but he did not go into the apartment. Instead, defendant waited on the porch for E.M. to return. (On cross-examination, defendant admitted that he did not have permission to be on the porch.) When E.M. arrived home and was going to enter Arallano's apartment, defendant picked her up to carry her into her apartment to talk. Defendant testified that he did not drag E.M. and that it was common for him to pick her up and take her to talk. When they entered the apartment, defendant set E.M. on the bed. Defendant testified that they talked for about five minutes. At that point, E.M. announced that she was going to go out to visit a friend and asked defendant to take her. Defendant declined to go.

Defendant testified that he then locked the bedroom door. He removed E.M.'s shoes, pants, and underwear, and E.M. laughed and did not try to stop him. Defendant testified that he did not threaten E.M. or display anything to her that he could use to hurt her. Defendant denied striking or injuring E.M., and denied that he forced her to have sex. Defendant testified that E.M. did not scream or call for help and that she did not tell him to stop, but said only that he should not play around with her.

After completing the sex act, defendant and E.M. got dressed and sat on the bed to talk. Defendant testified that he planned on going to California, but that E.M. did not want him to go. Defendant asked

E.M. to accompany him to California and E.M. replied that she would think about it for a week. Next, E.M. asked defendant to make food for her, and then the police arrived. Defendant denied that he told E.M. to get dressed and tell the police that nothing had happened. E.M. left the bedroom, then ran from the apartment. Immediately after this, police pointed guns at defendant through a window. Defendant testified that, when the police arrived, he did not have time to do anything, like place a knife on the dresser in the bedroom.

During jury deliberations, the jury sent a number of questions to the trial court. The trial court granted the jury's requests for transcripts of the testimony of defendant, E.M., Arallano, and Gonzalez. The trial court denied the jury's requests for the police reports and for a definition of "reasonable doubt." The jury asked whether the State could press charges against the victim's wishes, and the trial court answered, "yes." The jury further inquired about the Spanish word for "obligation," related to E.M.'s testimony about being obligated to have sex with defendant, and the trial court answered.

During the next day of the jury's deliberations, it asked, "What is the definition of present? Does one or more persons have to be inside *before* the trespasser or can it happen simultaneously? Does the fact that the defendant carried her in, constitute present?" (Emphasis in original.) Both attorneys took the position that the questions involved factual matters requiring that the jurors be instructed to continue to deliberate on the basis of the evidence and the law before them already. The trial court believed that the questions raised legal matters and instructed the attorneys to research the law.

After conducting research, defendant's attorney stated that defendant should receive a directed verdict because the evidence showed that no one was in the apartment when defendant entered, thereby vitiating an essential element of the State's case on home invasion. After argument, the court declined to direct a verdict in defendant's favor. The trial court did not answer the first of the jury's three questions, answered the second "no," and answered the third "yes." Defendant's objections and argument that the trial court's answers were tantamount to a directed verdict in the State's favor were rejected.

After about 13 hours of deliberation, the jurors sent a note to the trial court, stating that they believed that they were hopelessly deadlocked on the criminal sexual assault count, but had reached a verdict on the other charge, home invasion. The trial court stated that, after such lengthy deliberations and in light of the jury's manifest confusion (as indicated by the numerous questions) on what the court believed to be a simple case, it would declare a mistrial on the criminal

sexual assault count as a matter of manifest necessity. The jury found defendant guilty of home invasion.

On October 31, 2002, the State nol-prossed the criminal sexual assault count. Defendant timely filed a motion for a new trial that was heard and denied. Defendant was thereafter sentenced to an eight-year term of imprisonment and ordered to pay $2,411 in restitution to E.M. for her medical bills. Defendant timely appeals.

On appeal, defendant challenges the sufficiency of the evidence. When faced with a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). It is not the reviewing court's function to retry the defendant; instead, the determinations of the weight to be given the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. *Steidl*, 142 Ill. 2d at 226. This court will not set aside a criminal conviction on review unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *Steidl*, 142 Ill. 2d at 226.

Defendant specifically argues that, even when viewed in the light most favorable to the State, the evidence demonstrated that he did not enter the dwelling of another. Because this is an essential element of the offense of home invasion, defendant argues that the State failed to prove him guilty of the offense beyond a reasonable doubt.

■ A person who is not a peace officer commits the offense of home invasion when "without authority he or she knowingly enters the dwelling place of another" knowing someone is present and "[i]ntentionally causes any injury *** to any person or persons within such dwelling place." 720 ILCS 5/12—11(a)(2) (West 2002). Defendant argues that he did not enter "the dwelling place of another" because he still lived at the apartment on the date of the offense. We agree.

■ *People v. Reid*, 179 Ill. 2d 297, 314-17 (1997), provides initial guidance in analyzing defendant's argument. There, the defendant was charged with murder and sentenced to death based solely on the aggravating factor that the murder was committed in the course of a felony, namely, home invasion. *Reid*, 179 Ill. 2d at 314-15. The evidence showed that the defendant and the victim together had rented the apartment where the murder occurred. *Reid*, 179 Ill. 2d at 302. Shortly before her death, the victim had obtained a plenary order of protection against the defendant that awarded her exclusive possession of the apartment and forbade the defendant from having any contact with the victim. *Reid*, 179 Ill. 2d at 302. The defendant subsequently

entered the apartment and murdered the victim. *Reid*, 179 Ill. 2d at 305.

On appeal to the supreme court, the State argued that the order of protection rendered the apartment "the dwelling place of another" for the purposes of the home invasion statute. The supreme court rejected the State's argument and reasoned that, because the phrase "of another" had been added to the home invasion statute, the legislature had specifically sought to exclude domestic disputes from the reach of the home invasion statute. *Reid*, 179 Ill. 2d at 316. The supreme court held that "a defendant does not commit the offense of home invasion when he enters a dwelling which a protective order prohibits him from entering but of which he is an otherwise lawful tenant." *Reid*, 179 Ill. 2d at 316.

*People v. Taylor*, 318 Ill. App. 3d 464, 471-73 (2000), illuminates and amplifies the result of *Reid*. In that case, the defendant was convicted of home invasion, among other offenses, based on a theory of accountability when his codefendant, Heath, entered the victim's apartment and murdered the victim. *Taylor*, 318 Ill. App. 3d at 467. The court reversed the defendant's conviction of home invasion because the evidence showed that Heath had been staying at the victim's apartment as a regular overnight guest. The court found that Heath had permission to enter the apartment and thus did not enter the dwelling place of another. *Taylor*, 318 Ill. App. 3d at 473. Because Heath could not have committed the offense of home invasion due to the fact that he did not enter the dwelling place of another, the defendant could not be convicted of home invasion based on accountability for Heath's conduct. *Taylor*, 318 Ill. App. 3d at 473. Notably, the State attempted to argue that Heath was not actually staying in the victim's apartment. The court found that the State's argument was belied by the evidence, which showed that the victim had given Heath permission to enter the apartment and that Heath had been " 'staying with' " the victim " 'for a while.' " *Taylor*, 318 Ill. App. 3d at 473.

We find both *Reid* and *Taylor* to be on point in evaluating defendant's contention here. Taken together, *Reid* and *Taylor* instruct us to look beyond the form of the tenancy relationship and to determine the substance of the relationship, considering formal legal documents, informal arrangements, and any other evidence in the record when a defendant claims that he entered his own dwelling place, and not the dwelling place of another.

Here, the evidence was uncontradicted that defendant lived in E.M.'s apartment until at least March 4, 2002. While E.M. testified at trial that, on that date, defendant moved out of the apartment, she

gave conflicting statements to the police, saying that defendant had moved out two months before the incident. In addition, and most pertinently, when the State asked E.M. if defendant was living with her on March 21, 2002, she replied, "Yes. I couldn't get him out of there." The issue was further muddied by Arallano's testimony, acknowledging her general awareness that defendant was living in the apartment and specifically that, on March 21, 2002, she saw defendant carry E.M. "to her apartment where they lived." Thus, both State witnesses effectively conceded that, on March 21, 2002, defendant was resident in the apartment.

The evidence that defendant paid the rent on the apartment while E.M. was in Mexico was not contradicted. Also, the evidence showed that defendant still had many possessions, including some furniture, tools, and clothing, in the apartment. All of this "circumstantial" evidence, taken together with the victim's testimony that she could not get defendant out of the apartment, demonstrates that there is at least a reasonable doubt about whether he was still resident in the apartment on the date of the offense.

We note that defendant's own testimony was not without contradictions. Defendant admitted on cross-examination that he did not have permission to be "there," which is sufficiently ambiguous to refer to either E.M.'s house, Arallano's house, or the porch in front of Arallano's apartment. Depending on the contextual meaning of "there" chosen, it is conceivable that defendant himself effectively admitted that E.M.'s apartment was no longer his dwelling. However, based on the context of the cross-examination, we are convinced that "there" refers to Arallano's porch. Thus, while defendant's testimony is problematic, it does not amount to a concession that he was no longer a resident of E.M.'s apartment, but is only an acknowledgment that he did not have permission to be waiting for E.M. on the porch in front of Arallano's apartment. In any event, defendant's equivocal testimony, even taken in the light most favorable to the State, does not undermine his testimony that he was still resident in E.M.'s apartment on March 21.

Because the evidence is so unsatisfactory and unsettled, we find that a rational trier of fact could not conclude beyond a reasonable doubt, even while viewing the evidence in the light most favorable to the prosecution, that defendant entered the dwelling place of another. Because the State failed to prove that essential element, his conviction of home invasion cannot stand.

In urging that we uphold defendant's conviction, the State focuses on ownership rights as the primary indicium of whether a defendant has entered the dwelling place of another. The State explains the

result in *Reid* by noting that the defendant was still paying the rent on the apartment. *Reid*, 179 Ill. 2d at 301. The State also cites to *People v. Moulton*, 282 Ill. App. 3d 102, 107 (1996), which reached a similar result as *Reid*, holding that the defendant could not be convicted of home invasion because he did not enter the dwelling place of another, as the crime was committed in the home that he and his ex-wife jointly owned. The State crystalizes its argument by referring to *People v. Oakley*, 187 Ill. 2d 472, 480 (1999), where the supreme court distinguished *Reid* on the ground that the defendant's ownership interests had been extinguished by his divorce from the victim. We find all of the State's cases to be distinguishable because here, defendant and E.M. had no formal arrangement, whereas in *Reid*, *Oakley*, and *Moulton*, the defendant and the victim were formally renting or owning their dwelling together.

Further, the State fails to address how *Taylor* might change the analysis. In *Taylor*, there was no formal living arrangement between Heath and his victim that was memorialized on a rental agreement or deed; rather, the evidence showed that Heath was being permitted to stay regularly in the victim's apartment. That situation is little different from the one presented in this case, where defendant and E.M. agreed to cohabit, but did not sign any rental documents or get married. Most importantly, *Reid*, *Oakley*, and *Moulton* are distinguishable because here, there was testimony from the State's own witnesses, elicited on direct examination, conceding that defendant continued to reside in the apartment on the date of the offense. This testimony was supported by both circumstantial evidence (no forced entry and many of defendant's possessions remaining in the apartment) as well as defendant's own account. Therefore, we cannot accept the State's argument.

Because of our disposition of the "dwelling place of another" issue, we need not address defendant's remaining contention that the State failed to prove the essential element of injury to support his conviction of home invasion. For the foregoing reasons, therefore, the judgment of the circuit court of Kane County is reversed.

Reversed.

GROMETER and CALLUM, JJ., concur.