2022 IL App (2d) 210492-U
No. 2-21-0492
Order filed December 28, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17 CF 2548 |
| DJAVON A. HUDSON, | ) ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not commit plain error in denying defendant's request for standby counsel. First, the denial was not a clear or obvious error under the governing factors. Although the charges were severe, (1) defendant's request for standby counsel was equivocal, (2) his motivation for going *pro se* was simply to have an earlier trial date, (3) the case was not excessively complex, (4) prior counsel had significant trial preparation to share with defendant, and (5) defendant had the experience and ability to present his case. Second, any error in the denial of standby counsel was not plain error, because the evidence was not closely balanced, and the claimed error was not structural.

¶ 2    Following a bench trial, defendant, Djavon A. Hudson, was convicted of numerous

offenses, including attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)),

aggravated criminal sexual assault (*id.* § 11-1.30(a)(1)), home invasion (*id.* § 19-6(a)(1)), and violation of an order of protection (*id.* § 12-3.4(a)). The trial court merged additional convictions with those convictions. The trial court sentenced defendant to consecutive prison terms of 26 years for attempted first-degree murder, 26 years for aggravated criminal sexual assault, and 18 years for home invasion. The court also imposed a concurrent four-year prison term for violating an order of protection. On appeal, defendant contends that the trial court committed plain error when it denied defendant's request that his retained counsel be allowed to serve as standby counsel while defendant proceeded *pro se*. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                A. Pretrial Proceedings

¶ 5      On October 18, 2017, the State indicted defendant in case No. 17-CF-2548 on the following 21 offenses: 1 count of attempted first-degree murder (*id.* § 9-1(a)(1)) (count I), 11 counts of aggravated criminal sexual assault, variously alleging oral and vaginal penetration (*id.* § 11-1.30(a)(1), (a)(3), (a)(4)) (counts II-XII), 3 counts of home invasion (*id.* § 19-6(a)(1), (a)(2), (a)(6)) (counts XIII-XV), 1 count of armed violence (*id.* § 12-3.2(a)) (count XVI), 2 counts of aggravated battery (*id.* § 12-3.05(a)(1), (f)(1)) (counts XVII-XVIII), 1 count of domestic battery (*id.* § 12-3.2(a)(2)) (count XIX), 1 count of violation of an order of protection (*id.* § 12-3.4(a)) (count XX), and 1 count of criminal trespass to a residence (*id.* § 19-4(a)(2)) (count XXI). The charges stemmed from an incident on September 21, 2017. Together, the charges alleged that defendant entered, without authority, O.C.'s home at 2703 Galilee Avenue in Zion. Once inside, defendant stabbed Devontae Domino multiple times with a knife, intending to kill him and, in fact, causing him bodily harm. He also placed his penis in O.C.'s mouth and vagina using various means of force. The

charges further alleged that defendant committed these acts after being served with an order of protection prohibiting contact with O.C.

¶ 6    On January 31, 2018, the State indicted defendant in case No. 18-CF-241 on a single count of violating an order of protection. He allegedly sent O.C. a letter from the Lake County Jail. (Case No. 18-CF-241 is currently before this court in appeal No. 2-21-0550, with a pending motion to withdraw by the Office of the State Appellate Defender.)

¶ 7    The public defender was appointed as counsel in case Nos. 17-CF-2548 and 18-CF-241. The cases proceeded together. During the proceedings, defendant made numerous requests to discharge counsel, reinstate counsel, and discharge counsel again.

¶ 8    Ultimately, the State elected to proceed in case No. 18-CF-241. A jury trial began on February 10, 2020, with defendant representing himself. On February 13, 2020, the jury found defendant guilty of violating an order of protection. The trial court stayed sentencing pending the resolution of case No. 17-CF-2548.

¶ 9    On February 20, 2020, defendant, who was *pro se*, appeared with counsel, Robert P. Ritacca. Ritacca advised the trial court that he had spoken with defendant and his family regarding representation. The court told Ritacca that it would give him time to talk to defendant. Ritacca stated: "And, Judge, so everybody understands, if I get involved, I have to run the show. Okay? You have to listen to me. Okay? You've been here a long time." Defendant answered: "Yes." Ritacca continued: "I'm not going to play with what you believe and what other people believe. You've got to let me do what I think is the most important thing. Okay?" Defendant agreed.

¶ 10    On February 26, 2020, Ritacca advised the trial court that he had filed an appearance in both cases. Ritacca again stated to defendant: "[Defendant], if I'm involved in a case, I do the work. Okay?" Defendant agreed.

¶ 11    On July 27, 2020, Ritacca advised the trial court that he had "filed all [his] motions in th[e] matter" and "received all the police reports." He noted that two motions were outstanding: (1) a motion to dismiss on double-jeopardy grounds because defendant was charged twice with violating an order of protection and (2) a motion for severance as to the two victims.

¶ 12    On August 13, 2020, the trial court heard arguments on the two outstanding motions and denied them. Thereafter, the court asked: "Are we in a position to set the matter for trial or do we need one more status date?" Ritacca responded: "I am prepared for trial, Your Honor."

¶ 13    On August 20, 2020, at a status hearing, Ritacca indicated that the State might have made a previous plea offer to defendant. The trial court responded that it believed negotiations were ongoing between defendant and the State but was not sure whether the State had made a formal offer. Accordingly, the court asked the State to review its file and advise Ritacca.

¶ 14    On September 1, 2020, the State advised that it had revoked its previous offer. The court continued the matter to allow for discussions of a possible new offer. On September 8, 2020, Ritacca asked for more time to review discovery and discuss a new offer.

¶ 15    On September 29, 2020, Ritacca indicated that the defense wished to proceed to trial. The trial court set a trial date of November 30, 2020.

¶ 16    On November 23, 2020, the parties appeared for a case management conference. Ritacca indicated he had filed a discovery motion for (1) "[defendant's] phone[, which] was taken by the police and given back to [O.C.]," (2) "keys[, which] were part of the inventory belonging to [defendant]," (3) "[t]he landlord's lease[, which] should have been signed by [defendant] [and] was left in the apartment," and (4) "[the victim's] medical records." In response, the State indicated that it had tendered the medical records in the initial discovery. When the trial court inquired:

"What's this business about a lease?" the State responded that it was "not sure." The court asked the parties to "get the discovery cleared up" and continued the matter to December 17, 2020.

¶ 17    On December 17, 2020, Ritacca advised the trial court: "We are almost ready with [defendant]." Accordingly, the court set the matter for trial on January 20, 2021.

¶ 18    On January 20, 2021, defendant stated at the outset of the proceedings that, "[for] [p]ersonal and legal reasons *** Ritacca will no longer be representing [him]" and that he was "firing" Ritacca. Ritacca stated: "This is the first time I heard about it, Judge." Ritacca asked the trial court for a couple of days to discuss the matter with defendant. Defendant stated: "If it is okay, I'm pretty sure." The court asked defendant to give Ritacca the "courtesy" of discussing it with him, since Ritacca had been representing defendant "for a while now" and "ha[d] [the] case in a trial posture." The court continued the matter to February 3, 2021.

¶ 19    On February 3, 2021, Ritacca asked the court "for another date" and stated that he "want[ed] to go [to trial] probably as soon as possible." When Ritacca asked for the first week in March, defendant interrupted, stating: "You said that you would give me two weeks to figure out if I wanted to proceed by myself or not." Defendant told the court that he had discussed it with Ritacca and was proceeding by himself. Ritacca stated: "This is all news to me." The court told defendant that he had the right to proceed *pro se* but that the court needed to make sure that that was what defendant wanted to do.. The court told defendant to have an answer for it by March 4th. Defendant responded: "I do have the answer. Today is the day that I've waited to give that answer, and I'm literally giving that answer. I've talked to Ritacca. I let him know how I felt." Ritacca interjected, commenting: "If [defendant is] looking for the police reports, it's not going to happen because there's too many people that are involved." Ritacca continued: "I don't want anybody to

call these people other than me." Defendant stated that he had the right "to represent [himself] and to go to trial." The court continued the matter to February 11, 2021.

¶ 20    On February 11, 2021, the following exchange transpired:

"THE DEFENDANT: Um, Your Honor, I realize people have some concerns if allowed. I want to address the Court very briefly. If you allow me to, please.

THE COURT: Well, what is going on with Mr. Ritacca? Is he going to remain your attorney?

THE DEFENDANT: That's the thing. I realize the concerns of the Court, my attorney, my family and people praying across the nation have this concern about me going *pro se*, because even you rightfully so wanted me to think about it.

I understand why, because of the weight that would be on my shoulders and just because I have the right to go *pro se*, it doesn't necessarily give me the right to overstep people's concerns including yours, Your Honor, for me making decisions in the best of my well-being.

I understand your concerns and other's concerns, and for this reason I wish to meet people more than halfway and allow Ritacca the opportunity to stand back and stand by me if he chooses to actually help me through this matter as he says he wishes to do, but I am not changing my mind on going *pro se* and trying to set a trial date on this day, but whether or not Ritacca wishes to quit as standby counsel is upon him and I totally understand.

THE COURT: He is not going to be standby counsel. If he is in the case, he is in the case.

THE DEFENDANT: But I did hire him. I can allow him to be standby counsel.

THE COURT: Not without my permission you can [*sic*].

THE DEFENDANT: Of course with your permission.

THE COURT: That is denied. If you are *pro se*, you are *pro se*.

I am not in the practice of putting lawyers in what is essentially an unenviable position of trying both to serve their obligation to the Court as an officer of the court, and at the same time standing behind a defendant who has no formal legal education and is not in a position or well-suited, in fact, to conduct a trial in my estimation. That being said, it is your absolute right if you want to go *pro se*, I am going to let you do it. You just tell me.

THE DEFENDANT: Yes, sir, may we set a trial, please.

THE COURT: I didn't hear the answer to my question.

THE DEFENDANT: Yes, sir.

THE COURT: State, do you have the files with you right now?

MR. HUMKE [(ASSISTANT STATE'S ATTORNEY)]: I do not.

THE COURT: I want to advise [defendant] again of the maximums and minimums. I want to get all the files together. I am at a disadvantage. I don't have all the files myself at this moment. I am going to let you go *pro se*, but I have to complete the advisals.

[Defendant], I am going to discharge Mr. Ritacca. I will hold your case over on your motion until next week so I can do that. Okay."

The court then discussed with defendant (1) the court's obligation to advise him before accepting his waiver of counsel and (2) how soon the court could set the case for trial. The court continued the matter to February 17, 2021, so it could advise defendant before accepting his waiver of counsel and then set the case for trial. Ritacca interjected, and the following exchange occurred:

"MR. RITACCA: I talked to the family. I talked to the mother. I will also talk to the defendant. It's my opinion that it's not in his best interest to go *pro se* based on the nature of this offense.

He has certain defenses in this matter, but I don't think he is capable of raising those defenses. There is also certain strategy types of situations that we need to discuss, and I don't think he has any clue as to how to proceed with those issues. This is a family dispute that escalated to an attempt murder, home invasion, aggravated sexual assault. The numbers are enormous, enormous. Him going by himself, Judge, is not—

THE COURT: It not my place to get involved. I tried to talk to him in the past. I have spent a lot of time actually over the time that I have known [defendant]—I have tried to explain to him what is in his best interest. My hands are tied. A defendant wants to be *pro se*, he has the absolute right to do so.

I see he has a number of people that are here today interested in him. If they share your belief, Mr. Ritacca, they have until next Thursday to talk to [defendant] and have him allow you to continue to represent him and take him to trial. That is what I intend to do is to get his case to trial, whether or not he is *pro se* or not, so we will see you all back here in one week.

THE DEFENDANT: Your Honor, if I may ask, exactly what is it about me that I am not particularly—

THE COURT: It's anybody, [defendant].

THE DEFENDANT: I mean not being allowed standby counsel.

THE COURT: It's not you, [defendant]. I do not appoint standby counsel. I don't appoint them. I don't. If there is an attorney on the case, the attorney has the obligation to

make decisions. If the attorney is not being given the opportunity to make the correct decisions, you put the attorney in the position of committing malpractice, of doing unethical things or supporting unethical things.

The attorney is an officer of the court. Therefore, they are in a position to answer to the decisions that they are being allowed to fully make. That is not fair to do.

If you want to have an attorney, that is great. You can advise and consult with your attorney in your defense every step of the way. You can see all of your discovery, assist in the formulation of any theories of defense that you have. Absolutely you can do that, but when it comes time to make tactical decisions and make decisions that are supposed to be reserved for the attorney, the attorney makes those decisions and the attorney is responsible both to me and to the profession.

It's not fair to have somebody sit by and not be able to do their job, so that is why I won't do it. It's not you. I won't do it in any case, [defendant], I won't.

THE DEFENDANT: See you on the 17th.

THE COURT: It's the 18th."

¶ 21    On February 18, 2021, the trial court told the parties that it had received a motion via email from Ritacca and did not know how defendant wished to proceed. Defendant remarked: "I thought we were, like, 100 percent clear last week. I thought today was about me getting rearraigned and then setting a trial date." The court responded that it was "not clear on anything." Defendant commented that the court "literally discharged [Ritacca] last week." Ritacca stated that he would not withdraw until defendant hired or was appointed new counsel. Ritacca further explained: "The reason that he wishes me to get not involved is because I believed that he has certain defenses, and

he doesn't want to hear about those defenses." He stated: "I think if he just sits down, thinks about his options, then I think we can further proceed with me being his lawyer."

¶ 22    Defendant explained that "the elephant in the room" was that he "just want[s] to have this proceeding over with." The court explained to defendant the difficulty in setting the case for trial, given the chief judge's COVID-19 mitigation procedures and the number of anticipated witnesses. The court cautioned defendant: "[D]on't let your decision [to go *pro se*] be governed by the fact that you think that Ritacca is holding you back because I can't get jurors in my courtroom now." The court told defendant that it would put his case on the list of trials for April 5, 2021. Defendant asked Ritacca: "[Y]ou wouldn't be able to meet that date, would you?" Ritacca responded: "I'll push it, [defendant]. I'm trying to help you." After further discussion, Ritacca expressed concern about defendant going *pro se*. This exchange followed:

"THE COURT: Well, I think it's been resolved because you're going to be continuing representing him. He's going to abide by all the rules and court orders; otherwise, there's ramifications for not.

MR. RITACCA: Okay. Good, Judge. That's good.

THE DEFENDANT: I'm sorry. There was no part where I actually agreed to have him as my attorney. I thought I was still proceeding *pro se*, like, on the record last week we—

THE COURT: And we just had—[defendant], now you're confusing me. You just told me—

THE DEFENDANT: I'm trying to proceed *pro se* so I can go to trial as soon as possible, and I know that you said that that shouldn't be my mode of calculus because it's not up to me or up to—

THE COURT: Like I said, [defendant], Mr. Ritacca is not holding you back. The pandemic is holding you back.

Mr. Humke just told me there's 17 witnesses that I would have to call into my courtroom to have this trial conducted. Based on my understanding of how the health department, the chief judge, and the Supreme Court view that, I would say that, it is not entirely likely that you will be the very first trial that gets to go.

But you want to go *pro se*. That's fine. But, like I told you, it doesn't make it go any faster. Is that what you want to do? Because a minute ago you told me that you were going to have Mr. Ritacca represent you.

THE DEFENDANT: I understand everybody else's concern with me not going *pro se* so—I mean, I've tried—we've already established me going *pro se*.

THE COURT: We didn't establish anything. That's why—if I established it, I wouldn't be having this discussion with you right now. Are you—is that what you're telling me now? You want to go *pro se*?

THE DEFENDANT: I was saying it since January 20th, sir.

THE COURT: [Defendant], if you were me, you would be anywhere from clear on this because just during the course of this conversation we—two minutes ago had Mr. Ritacca saying he was coming over to see you right after court, which he would not be doing if he wasn't continuing to represent you. You also told me earlier that you were going to go ahead and have Mr. Ritacca represent you. Now you're telling me that you don't want him to represent you. Is that right?

THE DEFENDANT: That's exactly what I'm saying."

¶ 23    The trial court then admonished defendant of the charges against him and the sentences he faced. Defendant told the court that he wished to proceed *pro se*, and the court granted his request. Ritacca again objected to the ruling, and this exchange occurred:

"THE COURT: I don't have a choice. I don't have a choice, Mr. Ritacca. He has an absolute right to proceed *pro se* if he wants to do that. I've admonished him pursuant to Supreme Court Rule. He has been before me for a long time.

I understand what your concerns are, Mr. Ritacca. You could continue to try to work with him and work with his family. I see a number of them are present in court today. But I don't—I can't force him to do what he doesn't want to do. He'll make decisions; and if he makes decisions that affect him adversely, that's what every lawyer does.

MR. RITACCA: Judge, he's well educated. He speaks well. He—logically he makes great statements. He's—for me he's a good guy, but I hate to see him go for 120 years."

The court told defendant that it would set the matter for trial on April 5, 2021. Thereafter, defendant stated:

"—Ritacca obviously got some concerns, and he also is a dear friend of mine. I know he's really trying to help me.

Ritacca, can you please meet that trial date? Because I'm not spending the summer in [the] Lake County Jail. Like, if I got to go through this door or that door, I just want to get that part—this part of my life over with. I don't—"

The court then directed defendant and Ritacca to discuss the matter privately. However, "[a]s far as [the court was] concerned ***, *** [defendant was] *pro se*."

¶ 24    On March 18, 2021, the parties appeared for a status hearing. Ritacca and defendant were present. Ritacca informed the court that he was appearing for defendant because he was still unsure what defendant wanted to do or how the court would rule. Ritacca asked if he could make a statement to the court and defendant. The court allowed it. Ritacca stated that he believed it was a mistake to allow defendant to proceed *pro se* and defend himself alone against experienced prosecutors. He said that defendant would need a medical expert to discuss the victim's injuries and an investigator to examine the crime scene and interview witnesses. Ritacca specified:

> "There's a manager that needs to be interviewed. The manager being at [defendant's] apartment. [Defendant] was living in his own apartment, he was—he was—had his apartment entered through the alleged victim who had no permission to be there. That's not—that's not a violation of his home—of his apartment, he was residing there. There are keys. There are—"

The court interjected: "Okay. Mr. Ritacca, if this is a conversation you want to have with [defendant], that's fine." The court explained that it was required to allow defendant to proceed *pro se* if he wished. Ritacca responded that he did not believe that defendant was "physically fit to make those types of decisions by himself." Ritacca believed that "somebody" was telling defendant that the victims would not testify against him. In Ritacca's estimation, defendant was "rolling the dice" as to whether those witnesses would testify. The court replied that it would not "get involved in that." The court told Ritacca that he could talk to defendant and his family and that the court would "allow [Ritacca] to proceed as [defendant's] attorney and [Ritacca] can make the decisions, but if [defendant] is the attorney, [defendant] will make the decisions." At that point, defendant interjected and asked the court about witnesses. Defendant also asked if the trial would happen sooner if he elected a bench trial. The court declined to discuss that matter with defendant

but offered to let him speak with Ritacca. Defendant decided to talk with Ritacca. When the proceedings resumed, Ritacca said: "It's tough to bring a horse to water, Judge, if they don't want to drink." Ritacca stated that he was no longer representing defendant. Ritacca told defendant that he would "put together a trial book" for him and "give [him] all [his] work."

¶ 25    Defendant waived his right to a jury, and the matter proceeded to a bench trial on May 19, 2021.

¶ 26                                    B. Bench Trial

¶ 27                                    1. The State's Case

¶ 28    On September 5, 2017, the trial court issued an emergency order of protection in favor of O.C. and her three minor children and against defendant. The order was effective through September 26, 2017. In the space designated for her "address" or "alternative address," O.C. chose "alternative address" and listed "3144 Lebanon[,] Zion[,] IL." She listed defendant's address as "2813 Gideon[,] Zion[,] IL." Defendant was "ordered to stay at least 500 feet away from" O.C. and her children. Defendant was also "prohibited from entering or remaining while [O.C.] and/or [her three minor children] is/are present at": (1) "[t]heir place of residence," (2) "[t]heir school," and (3) other "specified places, when [O.C.] and/or [her three minor children] is/are present." The space for "place of residence" was left blank. In the space for "school" was written "Shiloh [E]lementary, Zion[,] IL." In the space for other "specified places" was written "3144 Lebanon[,] Zion[,] IL."

¶ 29    That same day, defendant was served at "2813 Gideon Ave[.,] Zion" with a "Short Form Notification" of the order of protection. The "Short Form Notification" provided: "You must not enter [O.C.'s] residence."

¶ 30    O.C., who was 26 years old, testified that defendant was the father of her four children (one of whom passed away in 2014) and that they had been in a relationship for about six or seven years. O.C. and defendant broke up about a month before the incident, "[d]ue to domestic problems." Before breaking up, O.C. and defendant lived together "[o]n 23rd and Galilee in Zion," along with their three children. When O.C. moved out, she took all her belongings to defendant's grandmother, Cynthia Taylor's, house. O.C. then stayed at hotels.

¶ 31    During the second week of September 2017, around the 8th or the 10th, O.C. moved into a small two-bedroom apartment at 2703 Galilee Avenue.[1] She lived there with her boyfriend, Domino (whom she had been dating for a few weeks); her three children; her best friend, Arianna Norman; and Norman's child. O.C. testified that she received housing assistance and had to pay only "a small portion of the rent." She testified that her name alone was on the lease for the apartment. Before moving into the apartment, she had an inspection done and the utilities turned on. O.C. put the ComEd bill in defendant's name, because his mother told her that "[defendant] would do his part of being a father somehow."

¶ 32    O.C. testified that, on the evening of September 21, 2017, she was at 2703 Galilee Avenue with two of her children, Domino, Norman, and Norman's child. (One of O.C.'s children was at O.C.'s grandfather's house.) O.C. and Domino fell asleep in their bedroom. O.C.'s baby was sleeping in a car seat next to the bed, and her other child was in the other bedroom. Norman and her child were asleep in the living room. O.C. woke up and saw defendant and Domino fighting.

---

[1]We take judicial notice (see *People v. Stiff*, 391 Ill. App. 3d 494, 504 (2009)) that 2703 Galilee Avenue is located several blocks due south of 23rd and Galilee, where O.C. testified that she lived with defendant prior to their breakup.

She testified that defendant "went to stab [her] daughter," so she grabbed the car seat and "slid her down the hallway to [Norman]." She saw defendant stabbing Domino "over and over" with a "small black throwing knife," which defendant wanted and she had ordered for him while they were dating. O.C. saw defendant stab Domino in the abdomen, chest, and back. Defendant initially stabbed Domino in the bedroom. Domino then ran to the front door twice, and both times defendant chased Domino and stabbed him. O.C. explained that the front door was locked when she and Domino went to bed. Domino unlocked it as he was being stabbed. After the stabbing, Domino returned to the bedroom, laid on the bed, and wrapped himself in covers. O.C. testified that there was "[b]lood all over [her] floor, [her] bed, the walls, the doors, [and] the hallway." O.C. identified several photographs of the apartment taken after the incident.

¶ 33    O.C. testified that, while Domino was lying on the bed, defendant was walking around the house, completely naked, occasionally asking Domino if he was dead yet. He also told Domino that he had " 'fucked with the wrong baby mama.' " O.C. heard defendant ask Norman if her brother was the father of O.C.'s baby. O.C. also heard defendant ask her five-year-old daughter for a hug. Eventually, O.C. and defendant went into her daughter's bedroom. O.C. was afraid that defendant would kill her and her children, so she told him various lies to appease him. Defendant held a knife to her vagina. He asked for oral sex, and she complied.

¶ 34    Defendant heard the police outside and told O.C. " 'You have to help me. You have to help me. You know without no weapon there is no case.' " O.C. helped defendant rinse off the knife and they hid it in the tiles of the bathroom ceiling. At O.C.'s direction, defendant climbed on the top of her daughter's closet. As O.C. exited the bedroom, the police arrived.

¶ 35    On cross-examination, O.C. testified that defendant, Norman, "Amanda," and "Petey" helped her move out of "23rd" and "Galilee" and take her belongings to defendant's grandmother's

house. O.C. did not put her new address—2703 Galilee Avenue—on the order of protection because she did not live there yet. Before the incident, defendant was never with her in the apartment at 2703 Galilee Avenue. Before the order of protection, she spoke with defendant's mother, who told her to put the ComEd bill in defendant's name. She testified: "Your mother's been telling me what type of stuff to do to make you do your part as a father." O.C. reaffirmed that she received housing assistance, stating it was "Section 8, Lake County housing." She also reaffirmed that she had a "signed lease" and that only she was named on it. She alone had a key to the apartment, but she "may have handed someone [her] key if they needed it." When defendant asked O.C. how he obtained access to the apartment on the night of the incident, O.C. testified that defendant "climbed through the window." She stated: "[T]hat's the only way you could have possibly gotten in. Everything else was locked." She also confirmed that she did not think they had vaginal sex on the night of the incident. She testified that, when the police asked her about an iPhone found in the apartment, she told them it was hers. The iPhone did belong to her, not defendant, but she had previously allowed defendant to use it "[f]or a while [*sic*]." She also testified that, after the incident, she was "locked out" of the apartment for awhile because defendant "came in there and almost killed a man and [the landlord] was scared for the rest of his tenants."

¶ 36    Domino, who was 29 years old, testified that, at the time of the incident, he was dating O.C. and living with her at 2703 Galilee Avenue, a basement apartment. He explained that there was another apartment across the hall and one common door to access the building. O.C.'s children also lived at the apartment, along with Norman and her child. When Domino arrived home from work before the incident, O.C., Norman, and the children were present. After eating, smoking marijuana, and having sex with O.C., he went to sleep with her in the master bedroom. O.C.'s baby

was also in the bedroom, asleep in her car seat. O.C.'s oldest daughter was in the other bedroom, and Norman and her child were in the living room. Domino testified that he and O.C. left the apartment window open when they went to sleep that night, because it was hot outside

¶ 37    Domino testified that he "woke up in like a cold sweat," and was "real wet." He saw blood on the wall. He saw defendant "going down with a knife in the dark" toward "[defendant's] younger daughter," who was in the car seat. Domino jumped up, pushed defendant, and started fighting him. Defendant dropped the knife, and Domino ran toward the front door and tried to unlock it. Defendant picked up the knife and stabbed him in the back before he could get out the door. Domino turned around, fought defendant again, and then ran down the hallway. Defendant chased him and stabbed him in the neck. Domino later learned that he also had stab wounds to his chest and arm. Domino fell to the ground and began coughing and spitting up blood. He crawled to his bed. He was tired and cold and wrapped himself up in a blanket. Defendant told him that he "chose the wrong baby momma, and [he will] die tonight." Domino saw defendant pacing in the living room and noticed that he was naked. Defendant had taken all the cell phones, but Domino hid his cell phone behind his mattress. He called 911. The police eventually arrived, and he was taken by ambulance to the hospital, where he spent four days.

¶ 38    On cross-examination, Domino testified that he moved into the apartment about two weeks before the incident and had never seen defendant "around there." When asked whose name was on the lease, he stated, "[m]ostly hers." His name could have been on the lease, but he was unsure. At the time of the incident, he had not seen a lease. He had keys to the apartment, and he and O.C. both received mail there. Domino also explained that, when he woke up, he was bleeding from his neck—not sweating, as he thought at the time. He saw defendant with a knife in his hand about to stab the baby.

¶ 39    Norman, age 26, testified that, on the day of the incident, she and her one-year-old daughter lived at 2703 Galilee Avenue with O.C., her children, and Domino. Everyone was present when Norman went to sleep that night, except for one of O.C.'s children. Norman slept in the living room with her daughter. Norman woke up when she heard "a thud, like somebody had fell or something, and [she saw] some—like a blurry person walking past." She explained that the person walked through the living room, from the window to the hallway. At first, she thought it was Domino. She started to go back to sleep but then heard O.C. screaming. She looked into O.C.'s bedroom and saw defendant stabbing Domino and trying to stab the baby, who was in a car seat. Norman testified that O.C. slid the car seat to Norman, and she took the baby into the living room with the other children. When she looked into the bedroom again, defendant asked her if she knew that her brother was the father of O.C.'s baby and if she knew what " 'bathing in your blood means.' " At one point, Domino got "[t]o the hallway to open the front door." She testified that he "unlocked it, but he couldn't get it open" because defendant started stabbing him in his kidneys. Domino crawled into the bedroom and closed the door. Defendant told her that he was not going to kill her but that she was going to watch everyone else die. He said he would bathe in their blood after killing them. Defendant was "completely naked" and "his penis was hard." Defendant opened the bedroom door and asked Domino if he was dead yet. Defendant and O.C. went into the other bedroom and closed the door. When Norman heard the police outside, defendant and O.C. left the bedroom. Defendant asked O.C. to help him, and they got cleaning products. Eventually, the police entered.

¶ 40    On cross-examination, Norman testified that she believed, but was not sure, that O.C.'s name was on the lease. Norman may have seen a lease, but she could not remember. Only O.C. and Norman had keys to the apartment.

¶ 41 Police officers testified that, at about 11:35 p.m. on September 21, 2017, they responded to a 911 hang-up call in the vicinity of 2717 Galilee Avenue. While in the area, they received information from dispatch that led them to 2703 Galilee Avenue, Apt. E. The officers had to break down the outer door to the building but found the apartment door unlocked. When they entered, they saw O.C. pointing at the bedroom, where they found defendant, who was naked and hiding on top of a "built-out closet." The officers arrested defendant, secured the apartment, sent Domino to the hospital, and processed the apartment for evidence.

¶ 42 Officers retrieved a black knife with a 3¼-inch blade from the bathroom ceiling. The knife bore DNA matching defendant's. The officers also located a package of zip ties and a man's watch outside on the ground next to the window well where defendant allegedly entered the apartment. Those items contained no DNA suitable for comparison. The window was halfway open. The court admitted into evidence photographs taken at the scene, including several photos of the window from different angles. Two fingerprints collected from the exterior windowpane matched defendant. The window was removed and processed for further evidence.

¶ 43 An emergency room physician testified that he treated Domino for several stab wounds to his neck, arms, chest, and abdomen. He required emergency surgery. The physician opined that, without treatment, Domino's injuries were life-threatening.

¶ 44 At the close of its case-in-chief, the State dismissed counts II-VII and XIII, all of which alleged that defendant penetrated O.C.'s vagina with his penis.

¶ 45                                    2. Defendant's Case

¶ 46 In addition to testifying in his own defense, defendant presented several witnesses, including his mother, grandmother (Taylor), sister, two cousins, a friend, and two police officers.

¶ 47  Jennifer Hudson, defendant's mother, testified that she never gave O.C. permission to put any bills in defendant's name. She testified that defendant always provided for O.C. and paid her rent even when he was living with another woman. On September 21, 2017, she went to Goodwill with defendant to buy a suit and afterward dropped him off at Taylor's house.

¶ 48  On cross-examination, Jennifer testified that she spoke with defendant by phone from jail after his arrest. During one of their conversations, defendant told her that, on the night he was arrested, O.C. had talked him into coming over. He also said "something about blood." She denied that defendant told her that O.C. "talked him into coming into the window." The State played a recording of one of Jennifer's phone conversations with defendant from October 2017. She agreed that, during the conversation, defendant stated "that he was curious enough to go through a window." However, she claimed that she had not heard this remark before. She also admitted that defendant talked about performing a "blood ritual." She claimed that, when defendant told her again that he "went through the window," she was "multitasking" and not "fully focused in on the conversation." She further testified that, "after the order of protection," defendant "was staying with his grandmother," who lived at 2813 Gideon Avenue. Jennifer confirmed: "That's where I took him that night," after they went to Goodwill.

¶ 49  Defendant's sister, Gevia Hudson, testified that O.C. was friends with Amanda Atkinson and that defendant used to "send[ ] them out to escort." In "September of 2017," Gevia saw O.C. and defendant together. Gevia was "around" when defendant was helping O.C. move. Atkinson was "around" too. Gevia saw defendant with O.C. and Atkinson on September 8, 2017. When asked where defendant and O.C. were living then, Gevia responded: "You guys were living in Hebron. I'm not sure. It was Galilee." Defendant paid the bills for O.C. even when they were not

together. In September 2017, defendant was dating a different woman but was "still *** around [O.C.] a lot."

¶ 50    On cross-examination, Gevia testified that, in September 2017, she attended Northern Illinois University. She lived in De Kalb but visited home "every weekend or so." She helped O.C. moved into an apartment on Galilee, but she stated that "[i]t was two different apartments on Galilee, so [she was] not sure." When asked if defendant was living there, she responded: "His stuff was there, so I think they were living." She was unaware that O.C. had an order of protection against defendant. She confirmed that she saw them together "in early September."

¶ 51    Defendant's cousin, Jamise McNeal, testified that she lived with Taylor—her and defendant's grandmother. Defendant did not live with Taylor, but he would visit every two to three days. McNeal could not remember the address where defendant was living at the time of the incident, but she stated that he was "staying on 22nd" and lived there with O.C. McNeal was shown a previously admitted photograph of the apartment at 2703 Galilee Avenue, and was asked whether it depicted the apartment where defendant was living at the time of the incident. She responded: "Yeah, yeah. Actually, yeah." McNeal testified that, when O.C. and defendant moved, they put their belongings in Taylor's garage. Everything was still in the garage when O.C. filed the order of protection and later when the incident occurred. Subsequently, however, O.C. took everything. McNeal did not maintain her relationship with O.C. after O.C. filed the order of protection.

¶ 52    On cross-examination, McNeal testified that she was aware of the order of protection and that defendant talked to her about "blood rituals." On September 21, 2017, defendant was "staying on 22nd" but left once O.C. obtained the order of protection.

¶ 53    Taylor testified that she lived at 2813 Gideon Avenue in Zion. Defendant visited her house regularly and ran a mechanic's shop out of her garage. Sometimes he would spend the night.

Defendant took care of the bills when he lived with O.C. Defendant also took care of his children. In September 2017, defendant and O.C. "were getting ready to move from 22nd Street over to the townhouses."

¶ 54 On cross-examination, Taylor testified that defendant and O.C. stayed with her for "a few days" before moving into their new apartment. She was present when defendant was served with the order of protection. "The order of protection came after the police come [*sic*] and got the kids." By that time, O.C. had moved out, "supposedly taking the deposit to the new place." That is, O.C. "left with the deposit money that they got from the previous apartment for the new apartment." After defendant was served with the order of protection, he stayed with Taylor.

¶ 55 On redirect examination, Taylor testified that she had no knowledge of defendant having contact with O.C. after the order of protection was served.

¶ 56 Robert Clarke testified that he was defendant's close friend and had known him and O.C. for 15 or 20 years. He testified that O.C. was a prostitute. When asked if he knew defendant "to be around 27th and Galilee," he responded: "Not much, every now and then if [defendant was] just walking from down the alley from 30th up that way." He "[did not] know [defendant] to be around there like a lot." On cross-examination, Clarke testified that he never saw defendant after he was served with the order of protection.

¶ 57 Zion police officer Manuel Rivera testified that he responded to the incident and prepared a written report. O.C. told him that Domino "made contact" with defendant and then an altercation ensued. O.C. "didn't claim to be asleep when this contact was made." Rivera did not know who held the lease on the apartment.

¶ 58 Zion police officer Sabas Mercado testified that he interviewed Norman and "attended a child's interview." Norman told him that she had heard sounds at the window and thought she then

saw somebody, fully clothed, walk past her. She thought she was dreaming until, shortly after, she heard screaming in O.C.'s bedroom.

¶ 59     Defendant was allowed to testify in a narrative fashion. In summary, defendant claimed that, on September 21, 2017, he went to 2703 Galilee Avenue twice. The first time he went there, he did so to "pick up a few things" and "change [his] shirt." When he arrived, he met Domino. He thought O.C. was "turning a trick," so there was "no tension" between him and Domino. He left and went to a "dice game." While there, defendant "got into a heated situation with rival gang members," and then a person showed up who defendant believed had killed one of his friends. Defendant thought he was "being set up," so he left the dice game to retrieve his gun and phone, which he left on the charger at 2703 Galilee Avenue.

¶ 60     When he returned to 2703 Galilee Avenue, O.C. would not give him his gun, and they argued. He also became angry when he noticed that his phone was missing. Defendant got nervous when he realized there were "multiple people outside," and asked Domino to leave. Domino started to argue with him, and defendant noticed that Domino had a tattoo on his chest from the same gang as the person who killed defendant's friend. Defendant again told Domino to leave. Domino then hit defendant and tried to wrestle him. Defendant fought back. He did not realize "how far that fight went" until he heard the doctor testifying about Domino's injuries.

¶ 61     Defendant denied doing anything sexual to O.C., but he stated that he understood why she would say that he did. According to defendant, he "conned [O.C.] into giving the landlord oral sex so that [he could] pay less rent to move into the apartment." He deceived her by telling her he would "give her the keys [to the apartment] when she was done." In fact, he kept them for himself. He further testified that he gave keys to Atkinson and was "going to give [the] apartment to [Atkinson] later on when [he] was done with it." Defendant explained that he "just wanted to use

[the apartment] for dice games." He also testified that he "needed to put a roof over [his] children's head [*sic*] at the time, so [he] allowed [O.C.] to be at the apartment."

¶ 62    On cross-examination, defendant admitted that he "stabbed" and "cut" Domino with the black knife. Defendant acknowledged inflicting the stab wounds to Domino that were shown in previously admitted photographs. He claimed that Domino hit him first and knocked him into the closet. Domino then pinned defendant to the ground. When defendant reached for the knife, which was under a nearby mattress, Domino got it first. Defendant grabbed the knife, and the blade cut him as Domino jerked the knife from his grip. Domino dropped the knife, and O.C. picked it up and handed it to defendant.

¶ 63    Defendant testified that the dice game occurred at "DeRay's house right across from the apartment." He was naked when arrested because he was in his boxers, changing his clothes, when Domino hit him. He later took off his boxers to wrap his bleeding hand. He admitted that he was served with an order of protection on September 5, 2017, but he thought it was a "scam" and that O.C. was trying to get out of paying him money that she owed.

¶ 64    Defendant testified that, on the day of the incident, 2703 Galilee Avenue was "[his] apartment" and O.C. "wasn't technically living there. She was just visiting." He stated that "[O.C.] punked [Atkinson] out of the keys." The following colloquy occurred:

> "[(ASSISTANT STATE'S ATTORNEY)]: You were living there?
>
> A. It was my apartment.
>
> Q. Okay, where were you living?
>
> A. I am sorry?
>
> Q. Where were you living?
>
> A. Specify when you say living.

Q. Where were you laying to sleep at night on September 22nd, 2017?

A. For most of the duration—wait, you talking about on the—wait, say it again.

Q. Where were you living on September 22nd, 2017?

A. 2703 Apartment—Galilee, Apartment E.

Q. So, you'd actually go there and sleep at night?

A. Not often at that time.

Q. Okay.

A. I mean I kind of spent my time at my grandmother's house with my family because there was some things I didn't want to know."

¶ 65    Defendant admitted that he and Jennifer were conversing on the October 2017 telephone conversation that the State had played in court during Jennifer's testimony. When asked about the "blood ritual" references and his statement that he "went through the window," he claimed that he was "talking jive." He said: "I can't fit through that window." He claimed he said those things because he was hoping to "get a pass to the mental house and possibly get some food for the holidays." He stated: "[I]f I, you know, slipped under the crack of the door to get in, that you wouldn't believe it, so I didn't believe you would believe I actually went through the window."

¶ 66    On redirect examination, defendant testified that he had no intention to kill Domino. He stated:

"This all started from a dice game and telling somebody that I didn't want them to be there. That's it. I paid. I paid to be there. I paid bills. I paid rent. I paid—I actually paid to be there. It was my apartment at the time, and God bless everybody. That's all's I got."

¶ 67   Defendant finished his testimony and rested his case. The State noted for the record that it had subpoenaed Rebecca C. (O.C.'s mother) at defendant's request and that she was present in the hallway. However, neither party called her to testify.

¶ 68                    3. Verdict, Posttrial Motion, and Sentencing

¶ 69   On July 15, 2021, following closing arguments, the trial court found defendant guilty of the remaining charges.

¶ 70   On August 6, 2021, defendant filed a "Motion for Post Conviction," arguing only that his statutory right to a speedy trial had been violated. The trial court denied the motion, noting that it had already ruled on the issue and found no reason to disturb its ruling.

¶ 71   Following an August 17, 2021, sentencing hearing, the trial court sentenced defendant to consecutive prison terms of 26 years for attempted first-degree murder (count I), 26 years for criminal sexual assault (count XI), and 18 years for home invasion (count XIV). The court also imposed a concurrent four-year prison term for violating an order of protection (count XX). Finally, the court merged all remaining counts into those counts.

¶ 72   This timely appeal followed.

¶ 73                              II. ANALYSIS

¶ 74   Defendant contends that the trial court abused its discretion when it denied defendant's request that Ritacca be allowed to serve as standby counsel. According to defendant, the court's decision was based not on the governing factors from *People v. Gibson*, 136 Ill. 2d 362, 380 (1990), but instead on the court's blanket policy of refusing standby counsel in all cases. Defendant acknowledges that he has forfeited the issue, but he argues that the court's abuse of discretion amounts to plain error under both prongs of the plain-error doctrine.

¶ 75    In response, the State contends that defendant's request for standby counsel was not valid, because defendant couched his request as a "compromise" in an attempt to accommodate both (1) his insistence on going *pro se,* whether or not Ritacca was willing to serve as standby counsel, and (2) others' concerns over him going *pro se*. Alternatively, the State argues that, under *Gibson*, the trial court's denial of standby counsel was not an abuse of discretion. Finally, the State argues that any error in the denial of standby counsel did not meet either prong of the plain-error doctrine.

¶ 76                                  A. Forfeiture

¶ 77    We begin by placing defendant's arguments in the proper context and establishing defendant's burden on appeal. Defendant admits that he failed to raise this issue in his posttrial motion and, thus, has forfeited it. See *People v. Ware*, 407 Ill. App. 3d 315, 350 (2011) (by failing to raise it in his posttrial motion, the defendant forfeited his claim that the trial court abused its discretion by denying his request for standby counsel). Nevertheless, he argues that we should review the issue for plain error.

¶ 78    Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) permits the review of unpreserved errors when:

> "(1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 79    Under either prong of the plain-error doctrine, the first step requires defendant to establish "a clear or obvious error." *People v. Jackson*, 2022 IL 127256, ¶ 21; see *People v. Camacho*, 2018

IL App (2d) 160350, ¶ 38 ("We begin a plain-error analysis by determining if there was reversible error in the first instance, as '[a]bsent reversible error, there can be no plain error.' " (quoting *People v. Cosby*, 231 Ill. 2d 262, 273 (2008))). If the reviewing court finds that a clear or obvious error has occurred, it is the defendant's further burden to persuade the court to excuse his forfeiture under the first or second prong of the plain-error doctrine. *Jackson*, 2022 IL 127256, ¶ 19.

¶ 80    "[E]rrors reviewable under the first prong of the plain error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error." *Id.* ¶ 23.

> "Analysis under the first prong of the plain error rule typically requires the same type of analysis as harmless error review. Harmless error analysis applies when the defendant has properly preserved a trial error for review; plain error analysis applies when the defendant has failed to preserve a trial error for review. The difference between harmless error analysis and first-prong plain error analysis is the allocation of the burden of persuasion. [Citation.]" *Id.* ¶ 23 n.1.

"[E]rrors that fall under the purview of the second prong of the plain error rule are rare." *Id.* ¶ 27. To obtain relief under the second prong, a defendant must show "structural error." *Id.* ¶ 28. If he does so, he need not show prejudice. *Id.*

¶ 81    Thus, we first consider whether defendant can establish that the trial court committed clear or obvious error when it denied defendant's request for Ritacca to serve as standby counsel.

¶ 82                              B. Clear or Obvious Error

¶ 83    Defendant contends that, where the trial court failed to consider any of the *Gibson* factors in denying standby counsel and, instead, based the denial on its own blanket policy against standby counsel, we should find that the court's failure to exercise its discretion was itself an abuse of

discretion that requires reversal. The State responds, first, that defendant did not make a valid request for standby counsel and, thus, we need not reach the issue. Alternatively, the State argues that, under the *Gibson* factors as applied to this case, the court did not abuse its discretion.

¶ 84 Before addressing the State's argument that defendant did not make a valid request for standby counsel, we set forth the substantive law governing such requests.

¶ 85 Although a defendant has the right to self-representation, such right "does not carry with it the right to legal assistance." *People v. Harris*, 2020 IL App (3d) 160169, ¶ 38. Accordingly, "one who chooses to represent himself must be prepared to do so." *Id.* Nevertheless, because there is no statute or rule prohibiting the appointment of standby counsel, the trial court may choose to appoint standby counsel for a *pro se* defendant. *People v. Khan*, 2021 IL App (1st) 190679, ¶ 72. In determining whether to do so, relevant criteria include "the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Gibson*, 136 Ill. 2d at 380. We review for an abuse of discretion a trial court's refusal to appoint standby counsel. *People v. Hui*, 2022 IL App (2d) 190846, ¶ 56. A court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view. *Id.*

¶ 86 In *Gibson*, after initially appointing an assistant public defender (APD) as standby counsel for the defendant, the trial court erroneously concluded that the Public Defender Act (Ill. Rev. Stat. 1987, ch. 34, ¶¶ 5601-5608) provided no authority for the appointment. Therefore, the court granted the APD's motion to withdraw. *Gibson*, 136 Ill. 2d at 372-75. The defendant's first trial resulted in a mistrial when the jurors could not agree on a verdict. *Id.* at 374. Following a second jury trial, the defendant was convicted of murder and sentenced to death. *Id.* at 365.

¶ 87    On appeal, the supreme court first determined that the trial court had the discretion to appoint standby counsel. *Id.* at 379. The court next considered whether the defendant was entitled to a new trial in light of the APD's withdrawal from the case. *Id.* The defendant argued, as does defendant here, that the trial court's "failure to exercise [its] discretion, without more, should necessarily require reversal of the judgment below." *Id.* at 380. In support, the defendant in *Gibson* relied on *People v. Queen*, 56 Ill. 2d 560 (1974), where the court noted that the trial court errs when it " 'refuses to exercise discretion in the erroneous belief that it has no discretion.' " *Gibson*, 136 Ill. 2d at 379 (quoting *Queen*, 56 Ill. 2d at 565). The court suggested that the "defendant's reliance on *Queen* may be questioned" (*id.* at 380) given *Queen*'s additional comment "that the effect of such a failure to exercise discretion must be assessed in the context of the entire proceeding." *Id.* at 379. The court also had critical remarks for the defendant's proposed remedy of automatic reversal:

> "[T]he utility of the defendant's suggested rule of automatic reversal is doubtful. For example, if it could be determined that the refusal to appoint standby counsel would not have been an abuse of discretion, there would be no purpose now in remanding the cause for further proceedings solely on the ground that the trial judge failed to exercise his discretion." *Id.* at 380.

The court in *Gibson* took the analytical path it outlined in these remarks. That is, the court could determine from the record that, had the trial court exercised its discretion in denying the appointment of standby counsel, it would have abused that discretion. *Id.* at 379-80. Thus, the *Gibson* court did not need to determine whether *Queen* supported automatic reversal based on the trial court's failure to exercise its discretion. *Id.*

¶ 88    In analyzing whether the trial court's denial of standby counsel would have been an abuse of discretion, the court began:

"Relevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant in a criminal case include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Id.* at 380.

After applying those factors to the facts of the case, the *Gibson* court concluded that, had the trial court exercised its discretion in denying standby counsel, it would have abused its discretion. The court noted that the defendant had been charged with a capital offense. The court further noted that the prosecution's case rested on forensic evidence, expert testimony, and testimony from the defendant's fellow inmates. The court found "[o]f particular significance" the fact that the trial court had appointed the APD as standby counsel when it believed it had the discretion to do so. *Id.* at 381. But later, the court permitted the APD to withdraw because the court came to believe that the appointment was not authorized by statute. *Id.* at 381. The court observed that the trial court's "initial decision reflected [its] view that appointment of standby counsel would be appropriate in the present case, and there is no indication that [it] later changed [its] mind in that regard." *Id.*

¶ 89    After finding that, had the trial court exercised its discretion in denying standby counsel, the denial would have been an abuse of that discretion, the *Gibson* court turned to the issue of prejudice. "Without determining whether the erroneous refusal to appoint standby counsel is prejudicial *per se* and must in every case necessitate a new trial," the court concluded that "[t]he prejudicial effect of the judge's erroneous ruling [was] apparent from a consideration of the trial proceedings." *Id.* at 381-82. The court noted the State's concession on appeal that certain evidence contradicting the defendant's theory was improperly admitted. The court further noted that (1) the

defendant's cross-examination of certain witnesses was "perfunctory," (2) he insisted on calling witnesses whose testimony the court had already ruled inadmissible, and (3) he repeatedly argued a previously rejected contention. *Id.* at 382. The court also emphasized that "[t]he jurors at the defendant's first trial were unable to agree on a verdict in the case, and the resulting mistrial illustrate[d] fully the closeness of the evidence in the case." *Id.* at 382-83.

¶ 90     Based on *Gibson*, the trial court's blanket denial here of defendant's request to allow Ritacca to act as standby counsel does not, without more, warrant reversal. As *Gibson* recognizes, "if it [can] be determined that the refusal to appoint standby counsel would not have been an abuse of discretion, there [is] no purpose *** in remanding the cause for further proceedings solely on the ground that the trial judge failed to exercise his discretion." *Id.* at 380.

¶ 91     We acknowledge this court's decision in *People v. Bernard*, 2021 IL App (2d) 181055. In *Bernard*, we held that the trial court's failure to recognize that it had the discretion to appoint counsel to represent the defendant on his petition under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2014)) was, standing alone, an abuse of discretion. *Bernard*, 2021 IL App (2d) 181055, ¶¶ 25, 27. We further held that reversal was warranted because the record did not conclusively establish that the error was harmless. *Id.* ¶ 35.

¶ 92     First, we note that *Bernard* is distinguishable because there is no indication in the present case that the trial court was unaware that it had the discretion to appoint counsel. In any event, *Gibson* clearly prescribes how we must conduct our analysis. We first consider whether, had the trial court considered the *Gibson* factors in denying standby counsel, that denial would have been an abuse of discretion. If the trial court would not have abused its discretion, then (as *Gibson* states) "there would be no purpose now in remanding the cause for further proceedings solely on the

ground that the trial judge failed to exercise its discretion." *Gibson*, 136 Ill. 2d at 380. If the trial court indeed would have abused its discretion, then the question turns to prejudice.

¶ 93 Defendant is critical of subsequent opinions interpreting *Gibson* "as holding that a defendant must show prejudice by showing that the judge would have abused his discretion if he had denied standby counsel after considering the appropriate factors." He directs us to *People v. Ware*, 407 Ill. App. 3d 315 (2011). In *Ware*, the defendant argued that the trial court committed plain error when it denied his request for standby counsel without considering the *Gibson* factors. *Id.* at 350-51. The court rejected the defendant's argument that the trial court's decision was a "blanket policy." *Id.* at 351. It then stated that, even if it agreed with the defendant's claim that the trial court's decision not to appoint standby counsel amounted to a "blanket policy," it "[could not] find that [the] defendant was prejudiced because, even if [the] trial court had exercised its discretion and denied [the] defendant standby counsel, that decision would not have been an abuse of discretion." *Id.* The court set forth the defendant's arguments based on the *Gibson* factors. Without concluding whether the *Gibson* factors themselves warranted a finding of an abuse of discretion, the court addressed the defendant's arguments as to how the absence of standby counsel negatively impacted him at trial. The court said that, "despite defendant's arguments [on the *Gibson* factors], [the court could not] find that the trial court would have abused its discretion in denying defendant standby counsel." *Id.* at 352. In support of that conclusion, the trial court discussed the pretrial and trial proceedings and noted that the evidence against the defendant was "overwhelming." *Id.* The court further commented that "[t]he presence of standby counsel likely would not have made a difference in [the] defendant's ability to defend his case." *Id.*

¶ 94 To be sure, it does appear that the *Ware* court incorporated a prejudice analysis into its discussion of whether the trial court abused its discretion. Similarly, in *People v. Harris*, 2020 IL

App (3d) 160169, when the court applied the *Gibson* factors in determining whether the trial court abused its discretion in denying standby counsel, the court seemed to implicitly incorporate a discussion of whether the defendant was prejudiced, as the court discussed the defendant's performance at trial. *Id.* ¶ 39. However, under *Gibson*, abuse of discretion and prejudice are separate issues.

¶ 95    We note, too, that defendant seems to be under the impression that *Gibson* did not address prejudice. He argues that "*Gibson* contains no discussion of the facts of the case or any prejudice the defendant suffered as a result of being without standby counsel." Again, citing *Bernard*, 2021 IL App (2d) 181055, ¶ 35, defendant argues that the proper test for determining prejudice is whether "the record does not conclusively establish that the defendant was not harmed by the error." However, as noted above, *Gibson did* discuss prejudice. Specifically, the court "conclude[d] that the defendant *was prejudiced* by the trial judge's failure to continue in force the appointment he was empowered to make." (Emphasis added.) *Gibson*, 136 Ill. 2d at 381-82. To support its prejudice finding, the court noted (1) the State's concession on appeal that the trial court improperly admitted certain evidence contradicting the defendant's theory, (2) the defendant's poor performance at trial, (3) the fact that the defendant's first trial resulted in a mistrial, and (4) the closeness of the evidence. *Id.* at 382. With clear and controlling guidance in *Gibson*, we need not consider *Bernard*.

¶ 96    We now determine whether, had the trial court considered the *Gibson* factors in denying defendant's request to allow Ritacca to proceed as standby counsel, that denial would have been a clear or obvious abuse of discretion. As noted, under *Gibson*, "[r]elevant criteria *** include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Gibson*, 136 ll. 2d at 380. However, we will not

address those factors here in a vacuum. Also relevant are the nature and context of defendant's request for standby counsel.

¶ 97    This is not the typical case of a *pro se* defendant seeking the appointment of standby counsel. By the time defendant first alluded to Ritacca serving as standby counsel—on February 11, 2021—Ritacca had been representing defendant for over a year. During that time, Ritacca had answered ready for trial on more than one occasion. On July 27, 2020, Ritacca advised the trial court that he had filed all his motions and received all the police reports. After the court resolved the pending motions, Ritacca answered ready for trial on August 13, 2020. On September 29, 2020, after a few continuances for purposes of plea discussions, Ritacca again answered ready for trial, and the court set a trial date of November 30, 2020. On November 23, 2020, Ritacca indicated that some discovery issues were pending, and the court continued the matter. On December 1, 2020, Ritacca again answered ready for trial, and the court set a trial date of January 20, 2021. Thus, by January 20, 2021, when defendant first indicated that he was "firing" Ritacca and wanted to proceed *pro se*, the case was ready for trial. Defendant made no mention of needing standby counsel. At that time, the court was well within its discretion to admonish defendant and allow him to proceed *pro se*. Nevertheless, because Ritacca objected to defendant's request to proceed *pro se*, the court continued the matter, allowing time for the parties to talk. On February 3, 2021, Ritacca asked the court for a trial date. Defendant again strongly indicated that he wanted to proceed *pro se*, and the court again continued the matter. On February 11, 2021, defendant stated:

> "I understand your concerns and other's concerns, and for this reason I wish to meet people more than halfway and allow Ritacca the opportunity to stand back and stand by me if he chooses to actually help me through this matter as he says he wishes to do, but I am not changing my mind on going *pro se* and trying to set a trial date on this day, but

*whether or not Ritacca wishes to quit as standby counsel is upon him and I totally*

*understand*." (Emphasis added.)

¶ 98     The State argues that defendant's remark was not a valid request, describing it as a

" 'compromise' " request. In support, the State cites *People v. Smith*, 2022 IL App (2d) 200338-

U, ¶ 20, where this court found that the defendant's request for " 'side counsel' " to help him with

notes was a request, not for standby counsel, but for a "note-taker." *Id.* Although we do not

necessarily agree with the State that the defendant made no genuine request for Ritacca to serve as

standby counsel, defendant certainly was ambivalent on the issue, indicating that "whether or not

Ritacca wishes to quit as standby counsel is upon him." Moreover, the record, particularly

defendant's comments on February 18, 2021, makes clear that defendant's motivation in

discharging Ritacca was to go to trial "as soon as possible." When the court proposed a date,

defendant asked Ritacca if he could "meet that date," and Ritacca responded that he would "push

it" because he was "trying to help [him]." Ultimately, defendant decided to go *pro se*. However,

even after being admonished and allowed to proceed *pro se*, defendant asked Ritacca if he could

"please meet that trial date."

¶ 99     Although defendant asserts that his motivation for seeking standby counsel does not matter,

we disagree. The trial court did not specifically inquire why defendant wanted standby counsel, as

the trial court did in *Smith*. Nonetheless, defendant's basis for the request was clear, and the court

should have considered it. Defendant wanted to go to trial as soon as possible, with or without

Ritacca. It was only because Ritacca continually opposed defendant's attempts to go *pro se* that

defendant stated that he would "allow Ritacca the opportunity to stand back and stand by [him] if

[Ritacca] chooses."

¶ 100   We note, too, that Ritacca *at no point* indicated that he was willing to act as standby counsel. Defendant argues that we have no way of knowing what Ritacca would have done if the court had granted defendant's request. We disagree. Ritacca made ongoing and strenuous objections to defendant being allowed to go *pro se*. Thus, we can reasonably conclude that, had Ritacca been willing to serve as standby counsel, he would have so indicated. Indeed, the record suggests that Ritacca would not have agreed to serve in that capacity. When Ritacca first took the case, he made clear that "if [he was] involved in a case, [he does] the work." He told defendant on the record: "I'm not going to play with what you believe and what other people believe. You've got to let me do what I think is the most important thing." At one point, Ritacca informed the court that he "believed that [defendant] has certain defenses, and he doesn't want to hear about those defenses." Ritacca also referenced police reports and stated: "I don't want anybody to call these people other than me." Moreover, as noted, defendant indicated that he wanted to go to trial as soon as possible and asked Ritacca more than once if he could meet a given trial date. Ritacca never unequivocally indicated that he could.

¶ 101   With the above in mind, we discuss the "relevant criteria" from *Gibson*, which include "the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Gibson*, 136 ll. 2d at 380.

¶ 102   Regarding the first factor, defendant contends that the charges here were serious. They included five separate Class X felonies subject to mandatory consecutive sentencing—creating a potential aggregate sentencing range of 30 to 120 years. 730 ILCS 5/5-4.5-25(a), 5-8-4(f)(1) (West 2016). The State concedes that this factor favors defendant, and we agree.

¶ 103   However, applying the second and third factors is not so clear cut. Neither factor overwhelmingly favors defendant. The case was not excessively complex. The allegations were

straightforward. There was no question what weapon defendant wielded against Domino or that defendant caused Domino's numerous severe injuries. His defense to attempted first-degree murder was that he acted in self-defense. His defense to home invasion was that he leased the apartment and did not enter through the window. His defense to sexual assault was simply to deny it happened, making the issue one of credibility. Notably, the case did involve medical testimony on the issue of Domino's injuries and forensic testimony from crime lab personnel—and this tends to favor defendant. See *Gibson*, 136 Ill. 2d at 381 (noting that the prosecution's case consisted of, among other things, forensic evidence, and expert testimony). However, even the critical forensic evidence was consistent with the defense. First, defendant's fingerprints on the exterior windowpane were consistent with his claim that the apartment was his. Second, his DNA on the knife was consistent with his claim that he grabbed the knife to defend himself.

¶ 104    As for defendant's abilities and experience, the record reflects that, at the time of trial, defendant was 28 years old. He had completed the 11th grade but did not graduate. He had an extensive criminal history and had previously represented himself at trial. See *Harris*, 2020 IL App (3d) 160169, ¶ 39 ("[the] defendant had a lengthy and extensive criminal history and, thus, would have had extensive familiarity with the criminal justice system"). The record reflects that defendant was very articulate. Defendant concedes that, during the former trial at which he represented himself, he "demonstrated that *** he was capable of conceiving a coherent defense," albeit on that occasion, his defense "lacked a legal basis and, in fact, effectively served as a confession to the offense." Defendant argues that his "background and performance in his first trial showed him to be a capable litigant with very poor understanding of the law, who would have benefited immensely from guidance by standby counsel." However, we also consider that, by the time defendant made his request, Ritacca had answered ready for trial several times. Thus, Ritacca

had already done much of defendant's trial preparation. Indeed, Ritacca told defendant that he would "put together a trial book" for him and "give [him] all [his] work."

¶ 105   Thus, considering and reflecting on the totality of the factors as noted above, in combination with other circumstances—the equivocal and ambivalent nature of defendant's request for standby counsel, the motivation for the request, the relationship between defendant and Ritacca, Ritacca's failure to indicate that he would be willing to serve as standby counsel, and the procedural posture of the case—we cannot find a clear and obvious abuse of discretion in the denial of the request.

¶ 106   More importantly, even if the defendant could establish a clear or obvious error in the trial court's denial of his request for standby counsel, he cannot establish *plain* error. As noted, some decisions applying *Gibson* have considered prejudice in determining whether the trial court's decision to deny standby counsel was an abuse of discretion. Here, because defendant forfeited the issue, he *must* show prejudice in the context of plain error. He has not met that burden here.

¶ 107                         C. First-Prong Plain Error

¶ 108   As noted, to obtain relief under the first prong of the plain-error doctrine, defendant must establish that "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *Piatkowski*, 225 Ill. 2d at 565.

¶ 109   Defendant contends that the evidence was closely balanced, "particularly with respect to the charge of home invasion," and more particularly, on the issue of "whether [he] leased the apartment." Another "point of disagreement," he asserts, "concerned the manner in which [he] entered the apartment." As to the closeness of the evidence on the remaining convictions, he argues only that "had [he], with the assistance of standby counsel, been able to prove that he actually did rent the apartment, that would have significantly undermined the credibility of all of the State's

witnesses." The State responds that whether defendant had a lease on the apartment was irrelevant because the order of protection barred him from O.C.'s residence. The State also argues that the remaining evidence is not close.

¶ 110   In support of his argument about his home invasion conviction, defendant cites only two cases—*People v. Ried*, 179 Ill. 2d 297, 316 (1997), and *People v. Delacruz*, 352 Ill. App. 3d 801, 811-12 (2004)—for the proposition that he could not be guilty of home invasion if proven "that he leased the apartment in which the home invasion allegedly occurred."

¶ 111   We begin by setting forth the elements of home invasion as charged in this case (we note defendant failed to reference them). Section 19-6 of the Criminal Code of 2012 (Code) (720 ILCS 5/19-6(a)(1), (a)(2), (a)(6), (d) (West 2016)) provides:

> "(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present *** and
>
>> (1) While armed with a dangerous weapon, other than a firearm, uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs, or
>>
>> (2) Intentionally causes any injury, except as provided in subsection (a)(5), to any person or persons within the dwelling place, or
>>
>> ***
>>
>> (6) Commits, against any person or persons within that dwelling place, a violation of Section *** 11-1.30 *** of this Code.
>
> ***

(d) For purposes of this Section, 'dwelling place of another' includes a dwelling place where the defendant maintains a tenancy interest but from which the defendant has been barred by a divorce decree, judgment of dissolution of marriage, order of protection, or other court order."

¶ 112   As noted, defendant argues that he had a lease to the apartment and that a person cannot be convicted of home invasion for entering his own home. According to defendant, the evidence was closely balanced because only defendant and O.C. claimed firsthand knowledge of whether defendant rented the apartment. He argues that his "failure to introduce the lease can be explained by his lack of understanding of the rules of evidence and his inability to locate the document and the appropriate witness, both of which would have been helped had he had assistance from standby counsel."

¶ 113   The State responds that whether defendant leased the apartment is irrelevant because, even if he had a tenancy interest in the apartment, he enters the "dwelling of another" under section 19-6(d) if he has been barred from that dwelling pursuant to, among other things, an "order of protection." *Id.* § 19-6(d).

¶ 114   In reply, defendant argues that "the order of protection did not prohibit [him] from entering the apartment and, if [his] testimony was true, could not prohibit him from entering it." Without any explanation, he cites section 60/214(b)(2) of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/214(b)(2) (West 2016)). That section provides that an order of protection can "[p]rohibit respondent from entering or remaining in any residence, household, or premises of the petitioner, including one owned or leased by respondent, if petitioner has a right to occupancy thereof." *Id.* Subsection (b)(2)(A) of that section provides:

"A party has a right to occupancy of a residence or household if it is solely or jointly owned or leased by that party, that party's spouse, a person with a legal duty to support that party or a minor child in that party's care, or by any person or entity other than the opposing party that authorizes that party's occupancy (*e.g.*, a domestic violence shelter)." *Id.* § 60/214(b)(2)(A).

¶ 115   We presume defendant's argument to be that, if defendant had a lease for the apartment *and O.C. did not*, then O.C. would not have a right of occupancy and, thus, an order of protection could not prevent defendant from entering the apartment.

¶ 116   However, the evidence on the issue is not close. O.C. testified that she alone signed a lease for the apartment. Although no apartment lease was admitted into evidence, O.C.'s testimony about the lease was not contradicted. To be sure, defendant argues that one of his defenses to the home-invasion charge was that he leased the apartment. He argues that any failure on his part to contradict O.C.'s testimony—by introducing a lease that he signed—was because he did not have counsel. We note, however, that during his testimony defendant did not even suggest that he ever signed a lease. His testimony was that he paid the rent, and his name was on a utility bill. Thus, we will not presume the existence of a lease signed by defendant.

¶ 117   We continue to the cases upon which defendant relies, which seem to focus on the defendant's payment of rent. Defendant cites *Ried* for the proposition that "[d]efendant could not commit home invasion in [an] apartment he rented, even if he was forbidden from entering it by an order of protection." While that may be an accurate reflection of *Ried*'s holding, defendant fails to acknowledge that *Ried* predated the language of section 19-6(d) of the Code, enacted in 1998. See Pub. Act, 90-787, § 5 (eff. Aug. 14, 1998) (amending 720 ILCS 5/12-11, now codified at 720 ILCS 5/19-6). As section 19-6(d)'s language makes clear, "unless a defendant has *both* the

requisite tenancy interest *and* a possessory interest in the dwelling place, he can be charged with home invasion." (Emphases in original.) *People v. Howard*, 374 Ill. App. 3d 705, 712 (2007). "The tenancy interest alone is no longer sufficient." (Emphasis omitted). *Id.*

¶ 118   Defendant cites *Delacruz* for the proposition that, "[i]n the absence of evidence of a formal living arrangement, uncontradicted testimony that the defendant paid rent for [the] apartment precluded [a] conviction of home invasion in that apartment." To be sure, the fact that the defendant in *Delacruz* had paid rent for the apartment was a relevant factor in determining that the evidence was insufficient to find the defendant guilty beyond a reasonable doubt of home invasion. *Delacruz*, 352 Ill. App. 3d at 810-811. However, it was but one factor among many. Not only did the defendant pay rent, but both State's witnesses conceded that the defendant was residing at the apartment when the offense occurred. *Id.* at 811. Additional evidence showed that the defendant had many possessions in the apartment, such as furniture, tools, and clothing. *Id.* The court also noted that there was no evidence of forced entry. *Id.* at 812. *Delacruz* does not support defendant's argument that the evidence here was close.

¶ 119   Indeed, *Delacruz* makes clear that, when assessing whether a defendant who is or was in a relationship with the victim entered the "dwelling place of another," we are "to look beyond the form of the tenancy relationship and to determine the substance of the relationship, considering formal legal documents, informal arrangements, and any other evidence in the record." *Id.* at 810. Even taking as true defendant's claim that he paid rent and that his name was on the ComEd bill, these facts alone do not render the totality of the evidence close on the issue of whether defendant had a possessory interest in the apartment.

¶ 120   Here, O.C. testified that she obtained an order of protection against defendant on September 5, 2017, and defendant admitted being served with it. The order of protection prohibited

defendant from entering O.C.'s residence, but it did not provide a specific address for O.C. This makes sense, since O.C. testified that she moved into the apartment at 2703 Galilee Avenue during the second week of September 2017, *after* she had already obtained the order of protection against defendant. She testified that, when she obtained the order of protection, she was not yet living at 2703 Galilee Avenue. Before that time, she lived in hotels or, according to Taylor, stayed at Taylor's residence. O.C. further testified that, after obtaining the order of protection, she lived at 2703 Galilee Avenue with her three children, along with Domino, Norman, and Norman's child. Domino and Norman corroborated her testimony. She also testified that she obtained housing assistance, signed a lease, and paid "a small portion of the rent."

¶ 121   None of defendant's witnesses testified that defendant lived with O.C. after she obtained the order of protection on September 5, 2017. Jennifer (defendant's mother) testified that, "after the order of protection," defendant "was staying with his grandmother," who lived at 2813 Gideon Avenue. Jennifer stated that, on the evening of the incident, she shopped with defendant and then dropped him off at Taylor's house. Although McNeal was shown photos of 2703 Galilee Avenue and testified that it was where defendant lived, she also testified that, on the night of the incident, defendant was "staying on 22nd" (where the parties had previously lived) but left once O.C. filed the order of protection. Although McNeal's testimony was confusing, it established at least that defendant did not live with O.C. after September 5, 2017. Taylor (defendant's grandmother) testified that she was present on September 5, 2017, when defendant was served with the order of protection and that he thereafter stayed with her. In addition, although defendant stated that it was "[his] apartment" and that he "paid to be there," he also testified that he rented the apartment "to use it for dice games" and that he "needed to put a roof over [his] children's head [*sic*] at the time,

so [he] allowed [O.C.] to be at the apartment." We note, too, that defendant's evidence also established that he routinely paid O.C.'s rent even when he lived elsewhere.

¶ 122   Further, the overwhelming evidence established that defendant gained entrance through the window. See *People v. Lawrence*, 2020 IL App (1st) 171399, ¶ 33 (the defendant's use of a brick to gain entrance to the residence was a factor to consider in determining that the defendant committed home invasion despite his name being on the lease). Norman testified that she heard "a thud, like somebody had [fallen]" and she saw "a blurry person" walk from the window through the living room to the hallway. She then heard O.C. screaming. Domino testified that he and O.C. left the window open when they went to sleep that night, because it was hot outside. Defendant's fingerprints were found on the exterior windowpane. O.C. testified that the apartment door was locked, and that Domino attempted to unlock it to escape from defendant. Defendant told Jennifer, during a phone call from the jail, that he entered through the window. Defendant claims that standby counsel could have had someone visit the apartment to measure the window. However, the evidence on the matter was not close. Notably, the trial court viewed several photographs of the window.

¶ 123   Based on the foregoing, the overwhelming evidence established that defendant did not reside at 2703 Galilee Avenue on the evening of the incident. Accordingly, the evidence was not close on whether defendant committed home invasion.

¶ 124   Defendant does not make any specific arguments on the closeness of the evidence as to the other charges. He argues only that, if he had "been able to prove that the State's witnesses were lying about who leased the apartment and how they came to be in it on the night of [the offense], the judge would have been more inclined to believe [defendant's] version of events." Given the overwhelming evidence as to the remaining charges, we disagree that any evidence confirming

that defendant had paid the rent would have "significantly undermined the credibility of all the State's witnesses." On the contrary, such evidence would have had extremely limited impact on defendant's overall credibility.

¶ 125   Based on the foregoing, even assuming that the trial court committed a clear or obvious error, defendant has failed to meet his burden of proving first-prong plain error.

¶ 126                                    D. Second-Prong Plain Error

¶ 127   Defendant also argues that any error was plain error under the second prong of the plain-error doctrine. However, as noted, to obtain relief under this prong, it is a defendant's burden to show "structural error." *Jackson*, 2022 IL 127256, ¶ 28.

¶ 128   In support of his argument, defendant relies solely on *Gibson*. Defendant acknowledges that *Gibson* did not expressly discuss forfeiture or plain error. Nevertheless, he argues: "Given that *Gibson* contains no discussion of the facts of the case or any prejudice the defendant suffered as a result of being without standby counsel, the only reasonable interpretation of the holding is that the error was plain error because it involved a fundamental right." However, as noted, *Gibson* did indeed address prejudice. In fact, it expressly emphasized "the closeness of the evidence in the case." *Gibson*, 136 Ill. 2d at 383. Thus, if anything, we would assume that *Gibson* considered the issue as first-prong plain error.

¶ 129   Because *Gibson* does not suggest that defendant's claimed error rises to the level of structural error, and he makes no other argument for that conclusion, he has not met his burden of proving second-prong plain error.

¶ 130                                    III. CONCLUSION

¶ 131   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 132   Affirmed.